Jesse PITTS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 48A02–0807–CR–660.

Court of Appeals of Indiana.

April 14, 2009.

Transfer Denied June 11, 2009.

John T. Wilson, Anderson, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

Jesse Pitts appeals his conviction and sentence for murder.[1] Pitts raises two issues, which we revise and restate as:

I. Whether the trial court failed to permit Pitts to present a defense;

II. Whether the trial court abused its discretion in sentencing Pitts; and

III. Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

The relevant facts follow. On the evening of September 19, 2007, twenty-year-old Pitts called fourteen-year-old Amanda Brinker, whom he had known for three months, and had a conversation about meeting at a park the following day. The next morning, Amanda called Pitts between 6:00 a.m. and 6:30 a.m. Pitts left his home and picked Amanda up near her bus stop at 6:40 a.m. or 6:45 a.m.

Pitts drove Amanda to Edgewater Park in Anderson so they could smoke a joint. At some point, Pitts repeatedly struck Amanda on the back of her head with a jack handle that he had brought with him.

About an hour or hour and one half after Pitts had left home, he returned upset. At first, he did not say anything to his girlfriend, Barbara Howard, but then later said "something about getting jumped," that Amanda was out at the park, and that they had to go "out there and see about her." Transcript at 733, 735.

Pitts and Howard left the house and went to the park where they found Amanda in the river. Pitts and Howard left the park and stopped at a gas station where, at 8:10 a.m., Pitts purchased a grape cigarella, which is a "grape cigar of some sort." *Id.* at 569. Pitts and Howard then went home where Howard told Pitts that he needed to call the police. At 8:18 a.m., Pitts called 911, and said that he and his girlfriend were walking in Edgewater Park and saw a girl in the river that Pitts identified as Amanda.

The police and members of the fire department discovered Amanda's body lying face down in the river in shallow water no more than six to eight inches deep. At that point, it was clear that Amanda was dead. The back of Amanda's head was bloody and an open cut was visible. Amanda's belt "was loose to the point where it looked liked [sic] between two (2) belt loops you just grab it, almost like a duffle bag handle or something." *Id.* at 395. The police discovered a large amount of blood in the grass and determined that the body had been moved away from the area of the crime scene. Amanda's body was not visible from the asphalt path in the park.

---

1. Ind.Code § 35–42–1–1 (Supp.2007).

Amanda suffered multiple deep lacerations or blunt force injuries to the back of her head, a skull fracture, bleeding inside of the brain, and some swelling of the brain. Specifically, Amanda suffered "seven or eight or possibly more individual wounds to the back of the head," and "[t]here could actually be more, as some of them were overlapping." *Id.* at 545. Dr. Paul Mellen, a forensic pathologist, determined that the cause of Amanda's death was multiple blunt force injuries to the head. However, Dr. Mellen added the possibility of water contributing to Amanda's death and stated, "I'm not sure if [the multiple blunt force injuries to the head] alone-if she had not been in the water would've been fatal." *Id.* at 551. Dr. Mellen testified that there may be "a survival interval of minutes to hours where the brain swells and the person is still alive at that time and unconscious, but they're not dead yet." *Id.* at 556.

A search of Pitts's residence revealed a trash bag on the floor with some clothes in it. The police discovered a green shirt with blood stains and later DNA analysis determined that the blood was Amanda's. The police discovered a jack handle lying on the floorboard of Howard's car. The jack handle had possible hairs or fibers that were attached or embedded into the jack handle. DNA analysis of the swab from the grip of the jack handle was consistent with a mixture of the DNA profile obtained from the blood card standard of Amanda and the DNA profile obtained from the stain card from Pitts and a possible third contributor.

Pitts spoke to the police and told several different stories. Initially, Pitts said that Amanda called him that morning and asked if he had anything to smoke after school, but Pitts informed Amanda that he had to work. Pitts said that he and Howard went down to the park to walk and that he usually stops by the riverbank to check out the snakes, ducks, and geese. Pitts said that he noticed a body lying face down in the water, picked it up, and recognized the body as Amanda.

Pitts then said that he met Amanda at her bus stop, gave her a joint, and left. Pitts then said that he picked her up and went down to the park because Amanda wanted to smoke a joint. Pitts said that he left after someone shoved him and placed Amanda in a headlock. Pitts then said that the man that had Amanda in a headlock dropped her and took off towards the bike trail. Pitts said that he picked Amanda up, laid her back down, and went to his house.

Pitts then said that the stranger did nothing, that Amanda turned around to elbow Pitts in the face, that Pitts "took her leg out from underneath her," and that Amanda "hit the ground." *Id.* at 904. Pitts said that he "didn't hit her with anything." *Id.* at 905. Pitts then said that after he swept Amanda's leg, he did not "stick around to really check" her. *Id.* at 916. Pitts then said that after he performed the leg sweep maneuver, Amanda's head was bleeding, and he picked her up and put her on the other side of the walk. Pitts said that he tried to pick Amanda up by her belt and it "felt like something had broke or snapped or gave way." *Id.* at 955.

The deputy prosecutor then informed Pitts that "[t]he problem is the injuries do not match your little leg sweep theory." *Id.* at 972. After some discussion, Pitts then said that there was a metal pipe in the bike trails and he picked it up and was swinging it. Pitts said, "I was just swinging it around, and I turned around and looked at the bike trail because I thought someone was following me. When I turned back around, I swung and it hit the back of her head and she dropped." *Id.* at

989. Pitts said that he did not perform a leg sweep maneuver.

Pitts said that the pipe was a handle to a jack Pitts had in the backseat of his car and that he took the jack handle out of the car because he had been attacked in the park in the past. Pitts then said "I turned around and I didn't know she'd stopped. She stopped walking." *Id.* at 997. Pitts said that after he struck Amanda with the pipe, she hit the ground, and he picked her up and carried her over to the side and laid her on the ground.

The State charged Pitts with murder. Before jury selection, the State made an oral motion in limine for the exclusion of any evidence or information with respect to allegations of Amanda's alleged past sexual conduct with anyone including Pitts. Pitts argued:

> The only time we would even contemplate bring [sic] it up is one of the State's witnesses will be testifying as to DNA that was obtained from the victim's body. One of those pieces of evidence was a vaginal swab that did contain DNA from a semen sample and ultimately that sample was tested and Mr. Pitts was excluded as a contributor and I think based upon the timeline that's going to be painted, I think it's part of out [sic] defense ultimately in trying to explain an unaccounted period of time as to what could have happened to the victim that we would ask that we can at least ask the questions to whoever the expert is that's discussing the DNA.

*Id.* at 13–14. The trial court granted the State's motion subject to being reconsidered at a later time.

During the trial, Pitts asked the trial court to revisit the preliminary ruling on the State's motion in limine and asked to "be allowed to at least elicit that information from the individual that will present DNA, the DNA findings." *Id.* at 520. After argument, the trial court declined to overrule its previous ruling. During one of Pitts's offers of proof, Dr. Mellen testified that he administered a sexual assault kit, which is usually a normal procedure in a case that involves a young female, and that he did not find any injuries to the genitalia.

During another offer of proof, Tyler Sager, a forensic serologist with the Indiana State Police, testified that presumptive testing on an oral swab, a vaginal swab, and Amanda's pants indicated the possible presence of seminal material. Sager then performed confirmatory tests on these items, and the additional serological testing did not confirm the presence of seminal material. Sager explained that the presumptive test does not test for seminal material but tests for a component found in high concentrations in seminal material, and that this component can also be found in other body fluids such as saliva.

During the direct examination of Julie Ellis, an employee with a private DNA lab that performs contract work for the Indiana State Police, Ellis testified that some DNA was found on the pants that belonged to an untested male individual and the DNA "was found in the sperm fraction of the cutting." *Id.* at 657. Ellis also testified that she did not find any of Pitts's DNA on the pants. During an offer of proof, Ellis testified that the "DNA results obtained from the sperm fraction of the cutting of the pants are consistent with an untested male individual" and "[t]he DNA profile obtained from the stain card from [Pitts] is excluded as a contributor to that item." *Id.* at 665–666.

The jury found Pitts guilty as charged. At sentencing, the trial court found no mitigating factors. The trial court found

Pitts's criminal history to be an aggravating factor. At the sentencing hearing, the trial court noted that: (1) Pitts failed to take advantage of previous opportunities to correct his criminal behavior; (2) Pitts's relationships with people are based upon physical and mental dominance and physical abuse; (3) Pitts developed relationships with younger people by providing and selling drugs; (4) the murder was "unusually brutal, senseless," and "totally irrational;" and (5) Pitts "casually" disposed of the body in a "cavalier way." *Id.* at 1127. The trial court also noted that "there's no doubt in this Court's mind that [Pitts] presents a personality to society that's totally malevolent[;] it's pathological and deserves the maximum sentence in this case, which the Court will give him sixty-five (65) years in the Department of Correction." *Id.*

## I.

■■■ The first issue is whether the trial court failed to permit Pitts to present a defense. "[A] defendant has a right to present evidence tending to show that someone other than the accused committed the charged crime." *Allen v. State*, 813 N.E.2d 349, 361 (Ind.Ct.App.2004), *trans. denied.* The exclusion of such evidence by the trial court "appears inconsistent with substantial justice and therefore cannot be deemed harmless error." *Joyner v. State*, 678 N.E.2d 386, 390 (Ind.1997), *reh'g denied.* "Evidence is relevant when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Smith v. State*, 754 N.E.2d 502, 504 (Ind.2001) (quoting Ind. Evidence Rule 401). The Indiana Supreme Court has held that "evidence which tends to show that someone else committed the crime logically makes it less probable that the defendant committed the crime, and thus meets the definition of Rule 401." *Id.* (quoting *Joyner*, 678 N.E.2d at 389).

We review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind.1997), *reh'g denied.* We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner*, 678 N.E.2d at 390. Generally, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *Coleman v. State*, 694 N.E.2d 269, 277 (Ind.1998). In determining whether an evidentiary ruling affected a party's substantial rights, the court assesses the probable impact of the evidence on the trier of fact. *Id.* However, as noted above, if error results from the exclusion of evidence that indicates that someone else had committed the crime, the error cannot be deemed harmless. *See Joyner*, 678 N.E.2d at 390.

Pitts argues that "he should have been allowed to present evidence with respect to particular DNA evidence as to semen samples discovered on the victim." Appellant's Brief at 13. Pitts argues that "[t]he defense theory is that someone else could have been with the victim within a particular period of time when the defendant left the victim at the park and his return with his girlfriend." *Id.*

■■■ First, Pitts points to his offer of proof during Dr. Mellen's testimony in which Dr. Mellen testified that he performed a sexual assault exam on Amanda Brinker, which was sent to the police lab. Dr. Mellen testified that he administered a sexual assault kit, but that it was usually a normal procedure in a case that involves a young female. Dr. Mellen also noted that he did not find any injuries to the genitalia. We cannot say that the mere fact that Dr. Mellen administered a sexual assault

kit tends to show that someone else murdered Amanda. We conclude that this evidence would not have had a probable impact on the jury, that the exclusion of this evidence did not affect Pitts's substantial rights, and that the trial court did not abuse its discretion in excluding this testimony. *See Lashbrook v. State*, 762 N.E.2d 756, 758 (Ind.2002) (holding that the trial court did not abuse its discretion by excluding evidence that did not tend to show that another person committed the murder); *Mathis v. State*, 776 N.E.2d 1283, 1286–1287 (Ind.Ct.App.2002) (holding that the trial court properly excluded evidence that would not have had any impact on the verdict), *trans. denied.*

■ Second, Pitts points to his offer of proof during the testimony of Sager, the forensic serologist, in which Sager testified that presumptive testing of vaginal swabs and Amanda's pants revealed the possible presence of seminal material. However, Sager then testified that he performed confirmatory tests on these items and the additional serological testing did not confirm the presence of seminal material. Sager also explained that the presumptive test does not test for seminal material but tests for a component found in high concentrations in seminal material that can also be found in other bodily fluids such as saliva. Again, we cannot say that Sager's excluded testimony would have had a probable impact on the jury or tends to show that someone else murdered Amanda. We conclude that the exclusion of such testimony did not affect Pitts's substantial

rights and the trial court did not abuse its discretion in excluding this testimony. *See Lashbrook*, 762 N.E.2d at 758; *Mathis*, 776 N.E.2d at 1283.

■ Lastly, Pitts points to the testimony of Ellis, an employee with a private DNA lab that performed DNA analysis, in which Ellis testified during an offer of proof that "the DNA results obtained from the sperm fraction of the cutting of the pants are consistent with an untested male individual" and "[t]he DNA profile obtained from the stain card from [Pitts] is excluded as a contributor to that item." Transcript at 665–666. During the direct examination of Ellis and in the presence of the jury, Ellis testified that she found some DNA "in the sperm fraction of the cutting" that belonged to an untested male individual and that she could not find Pitts's DNA in the cutting. Transcript at 657–658. Thus, Ellis's testimony that DNA was discovered in the sperm fraction of the cutting and that this DNA did not belong to Pitts was already before the jury.[2] We cannot say that the trial court abused its discretion with regard to this testimony.

## II.

The next issue is whether the trial court abused its discretion in sentencing Pitts. The Indiana Supreme Court has held that "the trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular

---

2. Pitts also states, "As far as the non-sperm fraction of the vaginal swab, DNA results are consistent with a mixture of DNA profile obtained from Amanda Brinker and a minor male contributor. However, she could not specifically say Jesse Pitts was excluded." Appellant's Brief at 13–14. Initially, we note that DNA from a vaginal swab that did not exclude Pitts does not tend to show that someone else committed the murder. Moreover,

Pitts fails to develop this argument. Consequently, this issue is waived. *See, e.g., Cooper v. State*, 854 N.E.2d 831, 834 n. 1 (Ind.2006) (holding that the defendant's contention was waived because it was "supported neither by cogent argument nor citation to authority"); *Shane v. State*, 716 N.E.2d 391, 398 n. 3 (Ind.1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument).

sentence." *Anglemyer v. State,* 868 N.E.2d 482, 490 (Ind.2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind.2007). We review the sentence for an abuse of discretion. *Id.* An abuse of discretion occurs if "the decision is clearly against the logic and effect of the facts and circumstances." *Id.*

A trial court abuses its discretion if it: (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law." *Id.* at 490–491. If the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.* at 491. However, the relative weight or value assignable to reasons properly found, or those that should have been found, is not subject to review for abuse of discretion. *Id.*

 Pitts argues that the trial court's consideration of his criminal history was improper because the trial court was not presented with specifics as to juvenile criminal activity. "Indiana courts have recognized that criminal behavior reflected in delinquent adjudications can serve as the basis for enhancing an adult criminal sentence." *Ryle v. State,* 842 N.E.2d 320, 321 (Ind.2005), *cert. denied,* 549 U.S. 836, 127 S.Ct. 90, 166 L.Ed.2d 63 (2006). The Indiana Supreme Court has "emphasized that it is the criminal behavior reflected in earlier proceedings rather than the adjudications that is the proper proof of a prior history of criminal behavior." *Id.* (citing *Jordan v. State,* 512 N.E.2d 407, 410 (Ind. 1987), *reh'g denied* ). "A trial court may treat a defendant's juvenile record as an aggravating circumstance if the presentence investigation report contains specifics as to juvenile criminal activity and those specifics support evidence of a history of criminal activity." *Davenport v. State,* 689 N.E.2d 1226, 1232 (Ind.1997), *clarified on reh'g,* 696 N.E.2d 870 (Ind. 1998).

Pitts cites *Allen v. State,* 722 N.E.2d 1246 (Ind.Ct.App.2000), in support of his argument. We find *Allen* distinguishable. In *Allen,* the defendant argued that the trial court erred by relying on his delinquent activity as an aggravator. 722 N.E.2d at 1256. The defendant's juvenile record reflected that he was arrested approximately fifteen times but was adjudicated a delinquent only once. *Id.* This court held that "upon reviewing [the defendant's] juvenile criminal report, it is impossible to determine the exact offense or offenses for which he was adjudicated a delinquent in May 1995." *Id.* at 1257. The court concluded that the trial court improperly relied upon the defendant's juvenile history in imposing consecutive sentences. *Id.*

Here, unlike in *Allen,* the presentence investigation report reveals the offenses for which Pitts was adjudicated a delinquent. Specifically, the report reveals that, in June 2003, Pitts was adjudicated a delinquent for committing an act that would be criminal conversion as a class A misdemeanor if committed by an adult. In October 2003, Pitts was adjudicated a delinquent after Pitts admitted that he committed acts that would constitute auto theft as a class D felony and resisting law enforcement as a class D felony if committed by an adult. In July 2004, Pitts was adjudicated a delinquent when he admitted to committing an act that would constitute

criminal mischief as a class D felony if committed by an adult. Based upon the record, we conclude that the trial court's reliance upon Pitts's juvenile history as an aggravator was not improper. *See, e.g., Davenport,* 689 N.E.2d at 1232 (holding that the presentence investigation report specifically detailed the defendant's juvenile charges and true findings and the trial court properly used this as evidence of criminal activity and as an aggravating factor); *Saylor v. State,* 765 N.E.2d 535, 559 (Ind.2002) (holding that the defendant did not show that the trial court relied improperly on his juvenile record in imposing sentence when the record showed that the defendant engaged in a number of acts as a juvenile that would have been crimes if committed by adults), *reh'g granted and reversed on other grounds,* 808 N.E.2d 646 (Ind.2004).[3]

 Pitts also argues that "given [his] limited prior contact with the justice system and the non-violent nature of his prior offenses that are unrelated to the present offense, his criminal history is not a significant aggravators [sic] in the context of a sentencing hearing for Murder." Appellant's Brief at 12. Pitts essentially argues that the trial court gave his criminal history too much weight. Pursuant to *Anglemyer,* the relative weight or value assignable to reasons properly found is not subject to our review for abuse of discretion. Consequently, we cannot review Pitts's argument.[4] *See, e.g., Anglemyer,* 868 N.E.2d at 491.

## III.

 The next issue is whether Pitts's sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consid-

---

**3.** Pitts also cites *Jimmerson v. State,* 751 N.E.2d 719 (Ind.Ct.App.2001). In *Jimmerson,* the defendant claimed that the trial court erred by finding his criminal history or delinquent activity as an aggravator. 751 N.E.2d at 722–723. The defendant argued that the only evidence of such activity contained in the presentence investigation report was a juvenile delinquency adjudication for burglary. *Id.* The State essentially conceded that the trial court may have improperly used the defendant's juvenile criminal record as an aggravator because nothing in the record related the specifics of the juvenile offense. *Id.* at 723. Another panel of this court held that "because of the State's concession on this point, we conclude that the evidence in the record is insufficient to support the use of the prior criminal or delinquent activity aggravator." *Id.* We disagree with basing the conclusion upon the State's concession. *See Gardner v. State,* 591 N.E.2d 592, 593 (Ind.Ct.App. 1992) ("When the State concedes error, we are nonetheless duty bound to review the facts and apply the law correctly. Were we to accept a concession as dispositive of an issue, we would effectively abdicate our judicial function in favor of a party.") (internal cita-

tion omitted). However, we agree with the following footnote in *Jimmerson:*

> In spite of the State's concession on this point, we note that in *Davenport v. State,* our [S]upreme [C]ourt held that where "the presentence investigation report specifically detail[ed] defendant's juvenile charges and true findings, including one for child molesting [,]" the trial court properly used this as evidence of an aggravating factor. 689 N.E.2d 1226, 1232 (Ind.1997). The opinion does not relate that any specific underlying facts about the child molesting were, or had to be, included in the presentence report, apart from the existence of a juvenile disposition and an identification of the offense committed.

*Id.* at 723 n. 2.

**4.** Pitts also argues that the traffic violations he committed as an adult were infractions and not criminal offenses. Because we conclude that Pitts's juvenile history was a proper aggravator and we cannot review the weight given to this aggravator, we need not address Pitts's argument regarding his traffic violations.

eration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind.2006). Pitts argues that the maximum sentence is inappropriate.

Our review of the nature of the offense reveals that twenty-year-old Pitts picked up fourteen-year-old Amanda and drove her to a park to smoke marijuana before school. At some point, Pitts struck Amanda on the back of the head with a jack handle that he had brought with him. Pitts acknowledged that he used marijuana immediately prior to striking Amanda but stated that he was not impaired at the time of the offense. Pitts then picked up Amanda by her belt and carried her away. When police found Amanda, her belt "was loose to the point where it looked liked [sic] between two (2) belt loops you just grab it, almost like a duffle bag handle or something." Transcript at 395.

Amanda suffered multiple deep lacerations or blunt force injuries to the back of her head, a skull fracture, bleeding inside of the brain, and some swelling of the brain. Specifically, Amanda suffered "seven or eight or possibly more individual wounds to the back of the head," and "[t]here could actually be more, as some of them were overlapping." *Id.* at 545. Dr. Mellen testified that the perpetrator would have to be relatively behind Amanda and that the blows "almost certainly . . . were delivered from behind [Amanda]." *Id.* at 559–560. Dr. Mellen determined that the cause of Amanda's death was multiple blunt force injuries to the head. However, Dr. Mellen added the possibility of water contributing to Amanda's death and stated, "I'm not sure if [the multiple blunt force

injuries to the head] alone—if she had not been in the water would've been fatal." *Id.* at 551. Dr. Mellen testified that there may be "a survival interval of minutes to hours where the brain swells and the person is still alive at that time and unconscious, but they're not dead yet." *Id.* at 556.

After striking Amanda, Pitts went home and returned to the park with his girlfriend. After seeing Amanda in the river, Pitts stopped at a gas station, purchased a grape cigarella, and drove home. After they returned home, Pitts called the police after his girlfriend told him that he needed to do so. We agree with the trial court's description of the murder as "unusually brutal, senseless," and "totally irrational." *Id.* at 1127. We also agree with the trial court's description of Pitts's disposal of Amanda's body as "cavalier." *Id.*

Our review of the character of the offender reveals that Pitts told the police several different stories. Pitts argues that he has been a productive citizen because he has worked for his uncle for approximately seven years performing construction and framing work and was employed at a gas station at the time of the offense. However, Pitts gave fourteen-year-old Amanda marijuana. Further, at the sentencing hearing, T.C., a fifteen-year-old, testified that Pitts gave her marijuana. D.R., a sixteen-year-old, testified that Pitts sold him drugs once or twice. S.G., an eighteen-year-old, testified that Pitts was once her boyfriend and had supplied her with marijuana and prescription pills. The presentence investigation report reveals that Pitts has used "Xanax, Soma, and Hydrocodone" illicitly. Appellant's Appendix Vol. II at 9. Pitts has used marijuana for several years, and it is his drug of choice.

S.G., Pitts's former girlfriend, testified that Pitts had hit, slapped, pushed, and

strangled her, and had put a gun to her head because she dropped a glass. S.G. also testified that Pitts did not like her four-month-old niece and, when her niece died, Pitts laughed about it. Lastly, S.G. testified that Pitts drowned a dog in a bathtub and made S.G. watch. Pitts has had two protective orders issued against him in the past.

As a juvenile, in July 2003, Pitts was adjudicated a delinquent for two counts of being a runaway and committing criminal conversion. In October 2003, Pitts was adjudicated a delinquent for committing auto theft as a class D felony, resisting law enforcement as a class D felony, and being a runaway. In July 2004, Pitts was adjudicated a delinquent for committing criminal mischief as a class D felony. During Pitts's contact with the juvenile system, he "was afforded several opportunities to modify his behavior," but "[t]hese opportunities did not deter his criminal behavior." Appellant's Appendix Vol. II at 10.

After due consideration of the trial court's decision, we cannot say that the maximum sentence is inappropriate in light of the nature of the offense and the character of the offender. *See, e.g., Roney v. State,* 872 N.E.2d 192, 206–207 (Ind.Ct. App.2007) (noting the brutal nature of the offense in concluding a maximum sentence for murder was not inappropriate), *trans. denied.*

For the foregoing reasons, we affirm Pitts's conviction and sentence for murder.

Affirmed.

CRONE, J. and BRADFORD, J. concur.