

**FILED**

Sep 08 2016, 9:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott King
Russell W. Brown, Jr.
Scott King Group
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jason Tibbs, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | September 8, 2016 <br><br> Court of Appeals Cause No. 46A03-1501-CR-19 <br><br> Appeal from the LaPorte Circuit Court <br><br> The Honorable Thomas J. Alevizos, Judge <br><br> Trial Court Cause No. 46C01-1308-MR-278 |

**Barnes, Judge.**

## Case Summary

Jason Tibbs challenges his conviction for murder and the trial court's subsequent denial of his Indiana Trial Rule 60(B) motion for relief from judgment. We affirm.

# Issues

Tibbs raises three issues, which we restate as:

I. whether the trial court abused its discretion by excluding evidence of an alleged third-party perpetrator;

II. whether the trial court abused its discretion by excluding impeachment evidence; and

III. whether the trial court properly denied Tibbs's Trial Rule 60(B) motion for relief from judgment.

# Facts

On March 26, 1993, sixteen-year-old Rayna Rison was working at the Pine Lake Veterinary Hospital ("the clinic") in LaPorte County. She had a date scheduled that evening with her boyfriend, Matt Elser. Rison was scheduled to finish work at approximately 6:00 p.m., and Elser was waiting for Rison at her house. When Rison failed to return home, Elser called the clinic and then began looking for her. Elser first went to the clinic and noticed Rison's car was not there.

At approximately 7:30 p.m. that same day, someone observed what would later be identified as Rison's car parked along a road with its hood up. The police recovered the car the next day. Inside, police found a ring, which was later identified as belonging to Tibbs. On April 27, 1993, Rison's dead body was discovered in a pond. The forensic pathologist who performed Rison's autopsy concluded the cause of her death was asphyxia due to cervical compression—strangulation—and that her death was a homicide.

[5] Tibbs and Rison were friends and dated briefly in middle school or junior high school. By 1993, Tibbs had dropped out of high school but was still in touch with Rison and still had strong romantic feelings for her. On the day Rison disappeared, Tibbs contacted his friend Eric Freeman in the late afternoon and asked Freeman to pick him up and drive him to the clinic. Freeman borrowed his girlfriend Jennifer Hammons's ("Jennifer") Buick and picked Tibbs up at his house. Tibbs had previously introduced Rison to Freeman as his girlfriend, and, on the day Rison disappeared, Tibbs told Freeman he "wanted to try to work things out with [Rison]." Tr. p. 81.

[6] When Freeman and Tibbs arrived at the clinic, Tibbs went inside to speak with Rison. After a short time, Tibbs and Rison came out of the clinic and talked; then they began to argue about their relationship. Tibbs and Rison got in the back seat of Jennifer's car, and the three "went driving." *Id.* at 84. Tibbs and Rison continued arguing. Either Tibbs or Rison asked Freeman to pull over. He did, and Tibbs and Rison got out and continued arguing behind the car. According to Freeman, Rison "just didn't want to be with [Tibbs]." *Id.* At some point, Freeman got out of the car and told Tibbs and Rison that he wanted to leave. Tibbs and Rison continued to argue, and Freeman observed Tibbs hit Rison then choke her with his hands. Freeman got back in the car, and Tibbs told him to open the trunk. Tibbs put Rison in the trunk, and Freeman drove back to the home of Rick and Judy Hammons, Jennifer's parents, where Freeman lived at the time.

[7]     When they arrived, Freeman parked the car in the Hammonses' pole barn. Freeman and Tibbs argued, and Tibbs stated, "If I can't have her nobody can." *Id.* at 87. After a short time, they left to get Rison's car. After Freeman and Tibbs left the Hammonses' barn, they returned to the clinic. Tibbs drove Rison's car away, and Freeman followed him in Jennifer's car. Together, the men dumped Rison's body in a pond, and Tibbs weighed it down with logs. Freeman, alone, then returned to the Hammonses' house in Jennifer's Buick. Later that evening, Tibbs stopped by the Hammonses' house, and Freeman gave him the letter jacket that had been left in the back seat of the Buick. The jacket was later discovered hanging in a tree and identified as belonging to Elser.

[8]     Unbeknownst to Freeman and Tibbs, Rickey Hammons ("Rickey"), Rick and Judy Hammons's fourteen-year-old son, was in the loft of the barn smoking marijuana when they arrived at the Hammonses' property. Rickey observed someone back Jennifer's car into the pole barn. He saw Tibbs close the barn doors and Freeman get out of the driver's seat. Rickey heard Freeman and Tibbs arguing and saw Freeman open the trunk of the car. Rickey saw a young, white woman in the trunk. "She was an off color, like-- she wasn't moving. She was-- I don't know. She didn't look like she had a lot of color in her face." *Id.* at 138. Rickey did not say anything to Freeman and Tibbs. After the men argued about what to do next, Rickey saw them leave in the car. When Rickey saw Rison's picture in the newspaper the next day, he recognized her as the girl

he saw in the trunk of his sister's car. He did not tell anyone about what he saw in the pole barn.

[9] Ray McCarty was Rison's brother-in-law. He was married to Rison's sister Lori McCarty ("Lori"). In 1991, McCarty plead guilty to Class D felony child molesting. Rison was the victim, and she became pregnant as a result of that molestation. McCarty was sentenced to serve three years on probation and was still on probation when Rison was killed. McCarty was indicted for Rison's murder near the time she was killed, but the State later dismissed the charges.

[10] For fifteen years, Rison's murder remained unsolved. In 2008, Rickey, who now was serving a sentence for an unrelated murder, contacted the police in order to tell them what he saw in his parents' barn in 1993. Rickey testified he neither received nor sought any benefit in exchange for his testimony. As a result of Rickey's information, investigators located Freeman and granted Freeman immunity in exchange for the information he had regarding Rison's murder. In 2013, the State charged Tibbs with murder. Freeman gave eyewitness testimony against Tibbs during Tibbs's trial.

[11] McCarty testified during Tibbs's case-in-chief that at approximately 5:40 or 5:45 p.m. on the night Rison disappeared, he looked at a house for sale directly across the street from the clinic. McCarty testified that after he left the house, he drove to the clinic to ask Rison if she knew where Lori was. McCarty testified the exchange with Rison took "[h]alf a minute," and then he left the clinic. Tr. p. 858. McCarty admitted he told police more than one story

regarding his whereabouts the night Rison disappeared. McCarty stated that he initially lied to police in order to prevent Lori from learning he had picked up a female hitchhiker that night because it might upset her. McCarty testified he did not threaten to harm Rison if she told anyone about his illegal sexual contact with her. Lori testified she did not recall telling a police officer that she vacuumed out the back of McCarty's car before police searched it, nor did she remember McCarty asking her to do so.

[12] During his trial, Tibbs attempted to ask Officer Timothy Short, who interviewed both McCarty and Lori, whether McCarty asked Lori to vacuum out his car before the police searched it. The trial court sustained the State's objection to the question. Tibbs also sought to question McCarty about the details of his divergent stories to police, but the trial court prohibited him from doing so.

[13] During an offer of proof, McCarty testified he was indicted for Rison's murder but was not tried. He also testified that he initially told police he was at a pig farm in the southern part of the county around or at the time Rison disappeared. As part of his offer of proof, Tibbs offered Rison's 1989 statement to police regarding McCarty's molestation. The statement states, "[McCarty] said that 'if I didn't do as he asked of me he would hurt me, and he said that if I ever told, he would KILL me.'" Ex. AA.

[14] Detective Brett Airy, who began re-investigating Rison's death in 2008, testified during an offer of proof that he reviewed the reports made during the original

murder investigation. He testified McCarty did not admit he had contact with Rison at the clinic until May 11, 1993, approximately six weeks after Rison disappeared, and further testified about the details of McCarty's differing stories regarding his whereabouts at the time Rison disappeared.

[15] In November 2014, a jury found Tibbs guilty of murder. The trial court sentenced Tibbs to forty years in the Department of Correction. This appeal ensued. Before filing his Appellant's Brief, however, Tibbs requested, and this court gave him, permission to file a Trial Rule 60(B) motion for relief from judgment in the trial court. Tibbs filed his motion and argued the State, in violation of *Brady v. Maryland*, withheld exculpatory evidence that Rickey received a benefit as a result of his testimony. The trial court held an evidentiary hearing on Tibbs's motion. Shortly after that evidentiary hearing, Tibbs filed an amended motion for relief from judgment and argued he had newly discovered evidence to support his contention the State committed a *Brady* violation. The trial court denied Tibbs's requests pursuant to Trial Rule 60(B). Tibbs now appeals his conviction and the trial court's denial of his motion for relief from judgment.

## Analysis

### I. Exclusion of Alleged Third-Party Perpetrator Evidence

[16] Tibbs first contends the trial court denied him his right to present a complete defense by excluding: 1) testimony that McCarty was indicted for Rison's murder; 2) Rison's 1989 statement that McCarty threatened to kill her if she

disclosed that he sexually abused her; 3) statements that McCarty asked Lori to clean out his car; and 4) the details of McCarty's inconsistent statements regarding his whereabouts the night Rison disappeared. Tibbs contends this evidence tends to show McCarty murdered Rison and that its exclusion was not harmless error.

[17] We review the trial court's ruling on the exclusion of evidence for an abuse of discretion. *Pitts v. State*, 904 N.E.2d 313, 318 (Ind. Ct. App. 2009), *trans. denied*. The trial court's ruling regarding the admission of evidence will be upheld if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory. *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008). We will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Pitts*, 904 N.E.2d at 318. Generally, errors in the exclusion of evidence are disregarded as harmless unless they affect the substantial rights of a party. *Id.* However, "if error results from the exclusion of evidence which indicates that someone else had committed the crime, the error cannot be deemed harmless." *Allen v. State*, 813 N.E.2d 349, 361 (Ind. Ct. App. 2004), *trans. denied*.

[18] "Evidence which tends to show that someone else committed the crime makes it less probable that the defendant committed the crime and is therefore relevant under [Evidence] Rule 401." *Dickens v. State*, 754 N.E.2d 1, 5 (Ind. 2001) (citing *Joyner v. State*, 678 N.E.2d 386, 389 (Ind. 1997)). Such evidence, however, may be excluded "if its probative value is out-weighed by unfair prejudice, confusion of the issues, or the potential to mislead the jury." *Pelley v. State*, 901 N.E.2d

494, 505 (Ind. 2009) (citing Ind. Evid. R. 403). "In the context of third-party motive evidence, these rules are grounded in the widely-accepted principle that before evidence of a third-party is admissible, the defendant must show some connection between the third party and the crime." *Pelley* 901 N.E.2d at 505.

[19] In *Joyner v. State*, 678 N.E.2d 386 (Ind. 1997), our supreme court concluded the trial court abused its discretion by excluding Joyner's proffered evidence that a third party committed the murder for which Joyner was convicted. In that case, Joyner unsuccessfully sought to introduce the following evidence with regard to the third party: he had an affair with the victim; he worked in the same place as the appellant and the victim; he saw the victim the day before the murder; he lied to his wife about where he was the night of the murder and later told her he had an argument with the victim on the last day she was seen alive; and he went to work late the day after the victim disappeared and lied about his tardiness on his time card. Joyner also successfully presented evidence that "was consistent with [his] theory that the crime was committed by [the third party]." *Id.* at 389. Joyner's evidence included expert testimony that a hair found inside the plastic bag covering the victim's head excluded Joyner as the "donor" of the hair and indicated there was a ninety-eight to ninety-nine percent probability match with respect to the third party. *Id.* Under those circumstances, our supreme court concluded "the defendant had sufficiently connected the third party to the crime, and the excluded evidence could have also established motive and opportunity" and remanded the case for a new trial. *Pelley*, 201 N.E.2d at 505.

In *Lashbrook v. State*, 762 N.E.2d 756 (Ind. 2002), our supreme court rejected an argument similar to that made in *Joyner*. Lashbrook wanted to introduce evidence that a third party previously stated the victim "was gonna die." *Id.* at 757. Our supreme court concluded, "In stark contrast to *Joyner*, the defendant presents no material evidence that [the third party] was connected to the crime. The phrase allegedly uttered by [the third party] that [the victim] 'was gonna die' does not tend to show that [the third party] committed the murder." *Id.*

In *Pelley*, our supreme court rejected the argument that the trial court denied the appellant his right to present a defense when it excluded evidence that a third party had a motive to commit the murders for which Pelly was convicted. Pelley was convicted of murdering his father, stepmother, and two sisters. He sought to introduce evidence that his father may have been killed because someone learned about money laundering at the Florida bank where Pelley's father previously worked. Pelley offered statements related to money missing from the bank and the family's subsequent move to Indiana, the fact the DEA closed the bank, and that a neighbor had seen a limousine with Florida license plates in the area of the Pelleys' home the night of the murders.

Our supreme court stated, "Pelley's case falls between *Joyner* and *Lashbrook*, but is much closer to *Lashbrook*." *Pelley*, 901 N.E.2d at 505. The court explained that Pelley's offer of proof was comprised of hearsay statements regarding Pelley's father's work at a Florida bank and "hearsay within hearsay" regarding the limousine. *Id.* It further explained that Pelley did not show that the witnesses who could testify regarding the Florida situation were competent to

do so—they were minors at the time the relevant events transpired in Florida. "Equally important," the court concluded, Pelley "failed to present any evidence connecting the bank or the limousine to the murders. Absent a more direct connection, the trial court did not abuse its discretion in excluding this evidence as too speculative." *Id.* at 506.

[23] In some cases, our appellate courts have not reached a conclusion regarding a direct connection between the third party and the crime and, instead, focused specifically on the exculpatory nature of the excluded evidence.

[24] In *Allen v. State*, 813 N.E.2d 349 (Ind. Ct. App. 2004), *trans. denied*, this court reversed a murder conviction because "Allen had the right to present evidence that [a third party] was involved in the commission of the crimes." *Id.* at 363. In that case, the trial court excluded testimony that the witness and a third party "cased" the Osco drug store where the murders took place; the witness encountered the third party coming from the direction of the Osco; the third party told the witness "he had just got some money and some people got hurt and got killed in it"; the third party showed the witness a handgun similar to the one used in the murders and told the witness it was "'dirty,' meaning it had 'a body attached to it, or bodies'"; and the witness saw the third party throw the gun into the river. *Id.* at 362 (citations omitted). The record, this court concluded, supported "a conclusion that [the witness's] testimony was exculpatory, unique, and critical to Allen's defense." *Id.* at 363. Such evidence, this court concluded, goes to the very heart of the fundamental

right to present exculpatory evidence, and the trial court's exclusion of the testimony impinged on Allen's right to present a complete defense. *Id.* at 363.

[25] We conclude the evidence Tibbs sought to introduce—that McCarty was indicted for Rison's murder; that in 1989 Rison reported McCarty threatened to kill her if she disclosed he sexually molested her; that McCarty allegedly asked Lori to clean out his car; and the details of McCarty's conflicting statements related to his whereabouts around the time Rison disappeared—was neither sufficiently exculpatory nor relevant evidence of a third-party perpetrator. None of the excluded evidence made it less probable that Tibbs murdered Rison or that McCarty was responsible for her murder as required under Rule of Evidence 401.

[26] We note that the evidence of McCarty's alleged threat to Rison is very similar to the evidence at issue in *Lashbrook*—the appellant's statement that victim "was gonna die"—which our supreme court concluded was not relevant. *Lashbrook*, 762 N.E.2d at 757. We further note that, with regard to McCarty's inconsistent statements regarding his whereabouts, McCarty himself admitted during his testimony that he was not forthright when police questioned him. *See Herron v. State* 10 N.E.3d 552, 557 (Ind. Ct. App. 2014) (concluding impeachment was "improper and unnecessary" after witness acknowledged her testimony was inconsistent with a pretrial statement and admitted she lied). Finally, like Lashbrook and Pelley, Tibbs wholly failed to establish any direct, material connection between McCarty and Rison's murder similar to that which was established by forensic evidence in *Joyner*.

[27]  Unlike the evidence at issue in *Allen*, the evidence Tibbs sought to introduce was not "exculpatory, unique, and critical" to Tibbs's defense. *Allen*, 813 N.E.2d at 363. "'Exculpatory' is defined as '"[c]learing or tending to clear from alleged fault or guilt; excusing."'" *Albrecht v. State*, 737 N.E.2d 719, 724 (Ind. 2000) (quoting *Samek v. State*, 688 NE.2d 1286, 1288 (Ind. Ct. App. 1997) (in turn quoting BLACK'S LAW DICTIONARY 566 (6th ed. 1990)) (alteration in *Samek*). None of the excluded evidence was relevant under Rule 401. Without clearing even that initial hurdle, it could not meet the definition of exculpatory evidence as required by *Allen*. The trial court's exclusion of Tibbs's proposed evidence did not impinge on his right to present a complete defense.

[28]  In addition to his general contention that the trial court's evidentiary rulings impinged on his right to present a defense, Tibbs argues his proffered evidence that McCarty was charged with Rison's murder was admissible "to show the motive or bias of the witness." Appellant's Br. p. 19. In support of that argument, Tibbs directs us to *People v. Steele*, 288 N.E.2d 355, 359 (Ill. 1972), and *State v. Wills*, 476 P.2d 711 (Wash. Ct. App. 1970), *review denied*.

[29]  In *Steele*, the appellant sought to introduce evidence that a witness in his murder trial was accused of the same murder, in what appears to have been an attempt to establish the witness's bias. The witness was present at the time of the murder and was called by the State "as [an] occurrence witness[] to the events which transpired in the apartment prior to the arrival of [the police]." *Steele*, 288 N.E.2d at 358. The Illinois Supreme Court concluded the trial court should not have excluded the evidence but noted that the witness denied any promises

or threats influenced his testimony, with the exception that the prosecuting attorney agreed to help him enlist in the military and leave the city. The court further concluded, "[i]n contrast, the jury was presented with overwhelming evidence of defendant's guilt . . . After examination of the record we find this error was harmless beyond a reasonable doubt and the jury would not have reached a different verdict even if the witness would have responded affirmatively to the question [of whether he was accused of the murder]." *Id.* at 360.

[30] In *Wills*, the appellant was convicted of murder in a case based entirely on circumstantial evidence. The "most damaging" was testimony from a witness who stated he observed Wills assault the victim the day before the murder in the same area of the same warehouse in which the murder took place. The witness further testified he said to Wills after the assault (which did not result in the victim's death), "Wills, you stomped that old man to death," and that Wills replied, "You don't know [the victim] like I do, he's tough, I've stomped him a lot of times." *Id.* at 712. Wills sought to introduce evidence that the witness, too, had been charged with the victim's murder, but that the charges had been dismissed. "The purpose of the proposed inquiry was to determine the effect the dismissal had upon [the witness's] testimony as a witness for the state." *Id.* The Washington Court of Appeals reversed Wills's conviction, concluding:

> The defendant was entitled to cross-examine [the witness] regarding the circumstances of the dismissal of the charges against him so that the jury could consider and weigh this testimony in its proper perspective. The scope and extent of that

cross-examination was within the discretion of the trial court but its refusal to allow any cross-examination into that area constitutes reversible error.

*Id.* at 713.

[31] We conclude these cases are inapplicable. Tibbs seems to rely on *Steele* and *Wills* for the narrow proposition that he had a right to admit into evidence the fact that the third-party perpetrator he put forth was previously indicted for Rison's murder. We, however, read these cases as discussing the constitutional rights to confront and cross-examine witnesses. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038 (1973). "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination . . . we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79, 106 S. Ct. 1431, 1435 (1986) (citations omitted) (quotations omitted) (emphases omitted).

[32] Unlike the witnesses in *Steele* and *Wills*, who testified against the appellants, McCarty did not testify against Tibbs. In *Steele* and *Wills*, the appellants sought to reveal biases that could have motivated the witnesses to give damaging testimony against them. Tibbs, in contrast, called McCarty as a <u>defense</u> witness in order to advance his theory of the case. McCarty's testimony was not damaging to Tibbs, and Tibbs's reliance on *Steele* and *Wills* is misplaced.

[33] Neither party directs us to any Indiana cases related to this argument. In *Standifer v. State*, 718 N.E.2d 1107 (Ind. 1999), our supreme court noted that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to [the] *Chapman* [*v. California*, 386 U.S 18, 87 S. Ct. 824 (1967)] harmless-error analysis." *Standifer*, 718 N.E.2d at 1110 (citing *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438).

> Whether the trial court's error is harmless depends on several factors including the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Standifer*, 718 N.E.2d at 1111.

[34] Assuming, without deciding, that the trial court's exclusion of the fact that McCarty was indicted for Rison's murder did somehow infringe on Tibbs's rights to confront and cross-examine, we conclude such error was harmless. McCarty's testimony was not central to (or even part of) the prosecution's case against Tibbs, and the State's case against Tibbs was extremely strong and included eyewitness testimony. We also note that Tibbs did successfully present evidence from which the jury could have concluded McCarty harbored a bias or motive to testify the way he did. We therefore conclude beyond a reasonable doubt that the presumed error did not contribute to the verdict. *See*

*Standifer*, 718 N.E.2d at 1110.  Thus, the trial court did not abuse its discretion by excluding from evidence the fact of McCarty's prior indictment for Rison's murder.

## II.  *Exclusion of Impeachment Evidence*

[35]   Tibbs next contends the trial court abused its discretion by excluding from evidence the transcript of Freeman's 2013 interview with Detectives Brett Airy and Al Williamson, which Tibbs states he sought to admit in order to impeach the veracity of the investigation.   Tibbs concedes he did not submit his proposed evidence in an offer of proof[1] and that we must review his claim for fundamental error.

[36]   Although we generally review rulings on the exclusion of evidence for an abuse of discretion, *Pitts*, 904 N.E.2d at 318, "[f]ailure to make an offer of proof of the omitted evidence renders any claimed error unavailable on appeal unless it rises to the level of fundamental error." *Young v. State*, 746 N.E.2d 920, 924 (Ind. 2001).  In order to successfully claim an error was fundamental, the appellant "must show that the error was a substantial and blatant violation of basic principles which rendered the result of the trial unfair." *Id.* (citation omitted).

[37]   We first note that the record is confusing, at best, with regard to Tibbs's attempt to introduce the transcript of Freeman's interview and the reason he wanted to

---

[1] Tibbs did append the transcript to his sentencing memorandum, and it is thus part of the record on appeal and available for our review.

do so. The State correctly notes that Tibbs did not explain why he introduced the transcript, and, instead, that the trial court suggested that he could have used it to impeach Freeman himself. *See* Appellee's Br. p. 31, n.2 (citing Tr. pp. 1090-91).

[38] In his Appellant's Brief, Tibbs states he attempted to introduce the transcript in order to impeach the veracity of the investigation. He argues that the transcript contradicts Detective Airy's testimony that neither he nor Detective Williamson asked leading questions or suggested answers during Freeman's 2013 interview and that the transcript "calls into serious question whether Freeman's testimony was based upon what he said he witnessed as opposed to the details of the investigation that the detectives shared with him during the subject interview." Appellant's Br. p. 27. But Tibbs's line of questions for Detective Airy at the time he sought to introduce the transcript provides no support for his argument on appeal. The following is the testimony preceding Tibbs's attempt to introduce the transcript:

> Q.   Is it fair to characterize you as the lead detective with respect to the death and disappearance of Rayna Rison?
>
> A.   Yes.
>
> Q.   And, on occasion, did you have the opportunity to conduct a recorded interview with Eric Freeman on June 27, 2013?
>
> A.   Yes.

Q.     Was that interview transcribed?

A.     Yes.

Q.     And it was also recorded audibly?

A.     Yes.

Q.     Have you had an opportunity to review the transcription and the recordings?

A.     Yes.

Q.     Were they accurate?

A.     Yes.

[Defense counsel identifies the exhibit and the State objects to its admission.]

Tr. pp. 1089-90.  After the trial court sustained the State's objection to the exhibit, Tibbs asked Detective Airy, "And you also had interviewed him before in March of 2008?" and then questioned him, generally, regarding his experience as a law enforcement officer.  *Id.* at 1092.  Tibbs concluded that line of questioning by inquiring whether Detective Airy or Detective Williamson asked Freeman leading questions or suggested answers during his 2013 interview.  But Tibbs did not attempt to introduce the transcript again, nor did he explain why he wanted to do so in the first place.

[39]   In his Appellant's Brief, Tibbs highlights several instances in the interview during which he contends the detectives "lead [Freeman] through his statement." *Id.* at 28. We note that in these portions of the interview Freeman gave answers (e.g., about the type of car he was driving when he took Tibbs to the clinic and the time he took Tibbs to the clinic) that differ from his trial testimony. We also note that Freeman admitted during his trial testimony that he was "scared and nervous" during his interview and that "at the end of [the interview]" he was honest and truthful. Tr. p. 102. We further note that, although Tibbs cross-examined Freeman regarding some of the discrepancies between his 2013 interview and his trial testimony, he did not attempt to introduce the transcript of the 2013 interview as impeachment evidence when he cross-examined Freeman.

[40]   Based on our review of the record, it is not clear why Tibbs sought to have the transcript of Freeman's 2013 interview admitted into evidence during Detective Airy's testimony. To the extent his purpose was to highlight what he thinks were questionable interviewing techniques and impeach the officers' investigation, we conclude he has waived that argument because there is no support for it in the record. To the extent his purpose was to impeach Freeman's testimony, we again conclude Tibbs has waived that argument because he did not introduce the exhibit at the appropriate time. Alternatively, we conclude the trial court's exclusion of the transcript did not prejudice Tibbs because the jury was aware that Freeman was not consistently forthright during his interview and because Tibbs had, and took some advantage of, the

opportunity to cross-examine Freeman regarding his inconsistent statements. We conclude the exclusion of the transcript did not infringe on Tibbs's right to a fair trial and, therefore, does not rise to the level of fundamental error.

### III. Motion to Correct Error

### A. Procedural Issues/Standard of Review

[41] Tibbs next argues that the trial court erred when it denied his Trial Rule 60(B) motion for relief from judgment. After this court gained jurisdiction of this case, Tibbs filed a motion asking this court to remand his case to the trial court so he could file a Trial Rule 60(B) motion. This court granted his request. Pursuant to *Logal v. Cruse*, an appellant must follow a specific procedure when he or she requests permission to return to the trial court to file a Trial Rule 60(B) motion, and this court must undertake a specific analysis when it considers that request. 267 Ind. 83, 368 N.E.2d 235 (1977), *cert. denied*.

> In short a party seeking to file a Rule 60(B) motion must file a verified petition with the appellate court seeking leave to file the motion. If the appellate court determines that the motion has sufficient merit, it will remand the entire case to the trial court for plenary consideration of the Rule 60(B) grounds.

*Whatley v. State*, 937 N.E.2d 1238, 1242 (Ind. Ct. App. 2012).

> Two considerations underlie our decision in *Logal*. One is the unfairness of requiring a litigant to elect either an appeal or motion for relief as remedy for an improper judgment against him. The other is the economy of judicial resources which can be effected by the avoidance of considering appeals made unnecessary by the granting of Rule 60 relief.

*Davis v. State*, 267 Ind. 152, 156 368 N.E.2d 1149, 1151 (1977).

[42]    In *Davis*, our supreme court concluded that, in some cases, "the interests of fairness and judicial economy militate in favor of applying the *Logal* procedure to post-conviction relief petitions made pending appeal." *Davis*, 267 Ind. at 156-57, 368 N.E.2d at 1151.  The court held:

> where an appellant from a criminal conviction seeks to bring a petition for post-conviction relief pending resolution of his appeal, he may obtain leave from the appellate court under the procedure outlined in *Logal* when the appellate court can find:
>
> (1) that the grounds for relief advanced in appellant's petition have a substantial likelihood of securing appellant relief in the trial court;
>
> (2) that such relief has a substantial likelihood of rendering moot the issues raised on direct appeal and would effect a net savings of judicial time and effort;
>
> (3) that the circumstances of the case are such that undue hardship would result to appellant were he required to await completion of his appeal to petition for post-conviction relief.

*Id.* at 157, 368 N.E.2d at 157.  *Davis* acknowledged its criteria may be "more stringent than those imposed on civil litigants in *Logal*," and explained, "they

are imposed because of the differences between Rule 60(B) and Post-Conviction Rule 1."[2] *Id.*

In addition to imposing different criteria, we review appeals from Trial Rule 60(B) motions and petitions for post-conviction relief under different standards. "The standard of review for the granting or denying of a T.R. 60(B) motion is limited to whether the trial court abused its discretion." *Anderson v. Wayne Post 64, American Legion Corp.*, 4 N.E.3d 1200, 1205 (Ind. Ct. App. 2014), *trans. denied*.

> A petitioner who appeals the denial of PCR faces a rigorous standard of review, as the reviewing court may consider only the evidence and the reasonable inferences supporting the judgment of the post-conviction court. The appellate court must accept the post-conviction court's findings of fact and may reverse only if the findings are clearly erroneous. If a PCR petitioner was denied relief, he or she must show that the evidence as a whole leads unerringly and unmistakably to an opposite conclusion than that reached by the post-conviction court.

---

[2] Notably, Post-Conviction Rule 1(a) provides, in part:

> (a) Any person who has been convicted of, or sentenced for, a crime by a court of this state, and who claims:
>
> * * * * *
>
> (4) that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice;
>
> * * * * *
>
> May institute at any time a proceeding under this Rule to secure relief.
>
> (b) . . . Except as otherwise provided in this Rule, it comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence and it shall be used exclusively in place of them.

*Massey v. State*, 955 N.E.2d 247, 253 (Ind. Ct. App. 2011) (citation omitted).

[43] It is uncommon for an appellant in a criminal appeal to request permission to file a Trial Rule 60(B) motion after jurisdiction has transferred to this court. Most, it seems, request permission to file a petition for post-conviction relief pursuant to *Davis* and *Hatton v. State*, 626 N.E.2d 442 (Ind. 1993). We note that our supreme court has stated that a Trial Rule 60(B) motion "is a remedy to be used in civil actions . . . and that the proper procedure [in a criminal matter] would have been for the appellant to proceed under the post-conviction relief rules." *Lottie v. State*, 273 Ind. 529, 538, 406 N.E.2d 632, 639 (Ind. 1980), *overruled on other grounds by Ludy v. State*, 784 N.E.2d 459 (Ind. 2003). Citing to *Davis*, the *Lottie* court further stated, "This Court has provided for procedures such as this under Ind. R. P.C. 1." *Lottie*, 273 Ind. at 539, 406 N.E.2d at 639 (citing *Davis*). We also note that in *McVey v. State*, 863 N.E.2d 434 (Ind. Ct. App. 2007), *trans. denied*, this court addressed the appellant's contention that the trial court abused its discretion by denying his Trial Rule 60(B) motion without a discussion of *Logal, Davis*, and/or *Lottie*. *See also Smith v. State*, 38 N.E.3d 218 (Ind. Ct. App. 2015).

[44] The State does not take issue with the procedure Tibbs followed here. Regardless of which procedure Tibbs should have employed, we follow the lead of our supreme court in *Lottie*: "The procedure would have been much the same under either [Trial Rule 60(B) or the post-conviction rules], and since the same question would have been presented to the trial court and to this Court in

the way in which it is presented here now, we will decide this issue." *Lottie*, 273 Ind. at 539, 406 N.E.2d at 639.

[45] The parties disagree regarding our standard of review given the procedure Tibbs chose to follow. Tibbs states he was "unable to find a standard of proof directly applicable to a Trial Rule 60(B) motion," (presumably in a criminal case) and argues, "since the issues raised [in his Trial Rule 60(B) motion] are commonly found in Petitions for Post-Conviction Relief, TIBBS contends that the preponderance of the evidence standard used i[n] PCR is applicable to his Rule 60(B) Motion." Appellant's Br. p. 30, n. 1. The State contends we should review the trial court's order for an abuse of discretion. *See* Appellee's Br. p. 32-33.

[46] Because the trial court entered findings of fact and conclusions thereon, we will employ a two-tiered standard of review. *Stronger v. Sorrell*, 776 N.E2d 353, 358 (Ind. 2002). First, we determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will only set aside the trial court's findings and conclusions if they are clearly erroneous. *Id.* We may not reweigh the evidence or reassess the credibility of the witnesses. *Id.* Instead, "we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them." *Id.* This "clearly erroneous" standard is similar to that used when we review the denial of a PCR petition. *See State v. Hollin*, 970 N.E.2d 147, 150 (Ind. 2012). Even if we were to review the trial court's order simply for an abuse of discretion, we would reach the same result.

## B. *Newly Discovered Evidence/Brady Violation*

[47] Tibbs contends Rickey and the State entered into an agreement under which Rickey would receive a benefit for his testimony against Tibbs and, alternatively, that the State offered Rickey a benefit in exchange for his testimony.[3] He argues that the evidence of the offer and agreement is newly-discovered evidence, the revelation of which entitles him to a new trial. He further contends the State failed to disclose the evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

> [N]ew evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

*Kubsch v. State*, 934 N.E.2d 1138, 1145 (Ind. 2010) (citing *Taylor v. State*, 840 N.E.2d 324, 329-30 (Ind. 2006)) (alteration in original), *cert. denied*.

[48] "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

---

[3] We note that Tibbs initially seems to raise separate contentions that 1) the State committed a *Brady* violation by not disclosing evidence of an agreement between Rickey and the State and 2) he had newly-discovered evidence that the State offered Rickey a benefit in exchange for his testimony against Tibbs. As he develops his argument, however, Tibbs refers to the alleged agreement and offer interchangeably. In order to ensure we thoroughly address the arguments he raises, we will assess whether evidence of either the alleged offer or the alleged agreement were newly discovered or withheld in violation of *Brady*.

punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196-97. "To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *Bunch v. State*, 964 N.E.2d 274, 297 (Ind. Ct. App. 2012) (quoting *Minnick v. State*, 698 N.E.2d 745, 755 (Ind. 1998) (in turn citing *Brady*, 373 U.S. at 87, 83 S. Ct. at 1194), *cert. denied*), *trans. denied*. "Evidence is material under *Brady* 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Bunch*, 964 N.E.2d at 297 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985)). "'Favorable evidence' includes both exculpatory evidence and impeachment evidence." *Bunch*, 964 N.E. 2d at 297-98.

[49] Tibbs alleges the State and Rickey entered into an agreement and that the State offered Rickey a benefit—"a time cut up to half of his sentence"—in exchange for his testimony against Tibbs. Appellant's Br. p. 32. The trial court found:

> 4. On March 10, 2008, Detectives Al Williamson and Mark Lochmond met with Rickey Hammons at the Wabash Valley Correctional Facility . . . Most, but not all, of this interview was recorded by the law enforcement officers.
>
> 5. According to Detective Williamson, the portion of the interview which was not recorded was not recorded at Rickey Hammons'[s] request. Whatever the fact of the matter may be, it

was during this unrecorded portion of the interview that a discussion was held about what, if any, consideration Rickey Hammons was seeking in return for the information he was providing. According to Hammons'[s] testimony at a clemency hearing in 2015 and again before this court, the detectives brought up the subject of a sentence reduction but Hammons told the detectives that he was not asking for anything in return for the information he was providing or any testimony he might give in the future. According to Detective Williamson, Hammons told the detectives that he did not want anything in return for the information he was providing or for any testimony he might give in the future, but for reasons which are unclear to this court Hammons did not want that statement to be part of the recorded interview. Detective Williamson testified at the hearings that he did not have the authority to make any offer to Hammons, that no offers or promises were made during the interview, and that the discussion as to any possible benefit to Rickey Hammons went no further that day or at any time thereafter.

* * * * *

12.     Prior to the filing of the charges against Jason Tibbs, Rickey Hammons hired a private attorney in 2013 to represent him in efforts to obtain a sentence modification in his own case. Hammons had previously filed a *pro se* petition for modification of sentence in 2010. That petition was summarily denied. According to the testimony of Hammons and the attorney he hired, this new petition for sentence modification was to be based on Hammons'[s] accomplishments and progress in the Indiana Department of Correction. Both testified that it had nothing to do with any cooperation Hammons was giving in the Tibbs case. The new petition for modification of sentence was not filed until after the Tibbs trial.

13.     Prior to the trial of the defendant, Rickey Hammons gave a deposition which was attended by Deputy Prosecuting

Attorney Christopher Fronk, the prosecuting attorney who tried the defendant's case to the jury. During that deposition, Ricky Hammons denied that he had been promised or received any consideration in return for the information he provided to the law enforcement officers or for his agreement to testify at the Tibbs trial.

14. Prior to the trial of the defendant, Rickey Hammons also filed a petition for clemency with the Indiana Parole Board. That petition made no mention of Hammons'[s] cooperation in the Tibbs matter.

15. As is standard procedure, the petition for clemency was presented by the Indiana Parole Board to the trial court judge and the prosecuting attorney for comment. The letters from the Indiana Parole Board were sent out prior to the trial of Jason Tibbs. The trial court judge responded by stating that he had no knowledge of the case as it had been heard by a different judge but that he found the timing of the petition curious in light of the fact that Rickey Hammons was scheduled to testify during the next month as a state's witness in the Tibbs trial. While it is not known for certain whether the office of the prosecuting attorney ever received the letter from the Indiana Parole Board regarding Rickey Hammons, the record is clear that the prosecuting attorney never responded favorably or unfavorably to the petition for clemency.

* * * * *

17. While Tibbs'[s] appeal was pending, Rickey Hammons appeared before the Indiana Parole Board for his clemency hearing in February, 2015. At that hearing, Rickey Hammons stressed his progress while in the Indiana Department of Correction. One of the members of the board, who had

researched the matter further based on the trial court judge's comment that Rickey Hammons was scheduled to be a state's witness in another matter, asked Hammons about his involvement in the Tibbs case. Hammons told the board that the detectives who first interviewed him in 2008 had made an offer of leniency to him, but that he had refused it because he did not want anything in return for his cooperation or testimony.

18. On August 7, 2015, Rickey Hammons by counsel filed a petition for modification of sentence with a request for hearing. The petition and the request were summarily denied by the trial court.

19. On September 1, 2015, Hammons'[s] attorney filed a motion to reconsider the denial of the petition for modification of sentence. This motion was joined by the deputy prosecuting attorney assigned to handle such petitions after communications passed between counsel, the deputy prosecuting attorney who prosecuted Tibbs, and the deputy prosecuting attorney handling the petition for modification of sentence.

20. Deputy Prosecuting Attorney Christopher Fronk testified to this court [during the post-trial evidentiary hearings on Tibbs's Trial Rule 60(B) motion] that, although no promises or hopes of promises had been given to Rickey Hammons, the deputy prosecuting attorney believed that the sacrifice Hammons had made in cooperating with the state deserved consideration.

* * * * *

25. A hearing was held on November 30, 2015, before the senior judge at which Rickey Hammons testified. Following the

hearing, the senior judge issued a *sua sponte* order to the Indiana Parole Board to disclose to the state and the defendant any information they might have regarding "any petition for clemency or parole that may have been filed by or on behalf of Rickey Hammons . . ." Such information did exist and was immediately provided by the Indiana Parole Board to the parties.

* * * * *

27.     A second hearing was held before the senior judge on December 7, 2015. Testimony was again received from Rickey Hammons and others regarding any possible agreement between the state and Rickey Hammons in return for his cooperation with law enforcement officers and his testimony at the Tibbs trial.

* * * * *

30.     Based on the evidence presented at the hearings on the motion to vacate judgment and amended motion to vacate judgment, the court finds that no formal or informal promises were made by the state or its agents to Rickey Hammons in return for his cooperation with law enforcement or his testimony at the trial of the defendant.

31.     Although witness Rickey Hammons has consistently stated and testified that he did not come forward with his evidence regarding Jason Tibbs in return for any agreement or promise of leniency, even if the court were to assume that he harbored a hope of special consideration after the fact, such hopes do not rise to the level of a constitutional disclosure violation even if there was a discussion of such a possibility during Hammons'[s] initial interview with the detectives. The uncontroverted evidence before the court is that there was no

agreement and Hammons made it clear from the beginning that he was not asking for or accepting any agreement. The evidence regarding the discussions between Hammons and the detectives at the initial interview additionally does not appear to rise to even the level of impeachment evidence that would qualify as favorable evidence which should have been disclosed by the state to the defense prior to trial.

32.    Even if the evidence is considered to have been favorable evidence which was not disclosed by the state, the court concludes that the evidence was not material to an issue at trial. Hammons['s] testimony corroborated Freeman's testimony on a very important point and cannot be considered insignificant. But when Freeman's eyewitness testimony of the events before, during, and after the killing are taken in concert with all of the other witness testimony which also corroborated some parts of Freeman's testimony, the court concludes that there is not a reasonable probability that the evidence of the discussions between Hammons and the detectives would have made a difference to the result of the defendant's trial. When taken in context, the evidence of the discussions is not sufficient to undermine confidence in the outcome of Tibbs'[s] trial.

App. pp. 811-22.  The trial court concluded the State did not commit a *Brady* violation.  *Id.* at 822.

[50]    The trial court also concluded:

34.    Regarding the defendant's separate claim that newly discovered evidence requires a new trial, the court finds and concludes as follows:

    a.    The evidence has been discovered since trial.

  b.  The evidence is relevant but not material.

  c.  The evidence is not cumulative to the extent that it could establish in the minds of some jurors that the detectives made an offer to Rickey Hammons which he refused.

  d.  The evidence is merely impeaching.

  e.  The evidence is not privileged or incompetent.

  f.  Due diligence was used to discover the evidence prior to trial to the extent that evidence of Hammons'[s] testimony before the Indiana Parole Board could not have been discovered before trial.

  g.  The evidence is worthy of credit to the extent that there were discussion between Hammons and the detectives at their initial interview about possible leniency.

  h.  The evidence can be produced at a new trial.

  i.  The evidence will not probably produce a different result at a new trial.

*Id.* at 822-23. The trial court concluded Tibbs did not establish the existence of newly-discovered evidence. *Id.* at 822.

[51] Tibbs does not challenge any of the trial court's findings of fact. Instead, he argues generally that the alleged newly-discovered evidence and *Brady*

violation entitle him to a new trial. Specifically, Tibbs contends the evidence was "beneficial" to his defense, would have "helped the jury better assess the reliability and honesty of the felon-witness Hammons," and was material because there is a reasonable probability that, if it had been disclosed, the outcome would have been different. Appellant's Br. pp. 33-34. He contends the evidence is relevant "to the jury weighing Hammons'[s] credibility which clearly sheds light on the guilt or innocence of Mr. Tibbs." *Id.* at 35-36.

[52] Because Tibbs does not cogently argue that the trial court's findings were not supported by sufficient evidence, he has waived that argument on review. *See City of Whiting v. City of East Chicago*, 359 N.E.2d 536, 540, 266 Ind. 12, 19 (1977). "[W]here a party challenges only the judgment as contrary to law and does not challenge the special findings as unsupported by the evidence, we do not look to the evidence but only to the findings to determine whether they support the judgment." *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000) (alteration in original). Although Tibbs does not challenge the trial court's findings of fact, he maintains that there existed an offer of leniency from the State and agreement between Rickey and the State, and he bases his arguments on appeal on those assertions. Because those erroneous assumptions are central to his arguments, we find it necessary to, briefly, consider whether the evidence supports the trial court's findings that no such offer or agreement existed. We conclude it does.

[53] Our review of the evidentiary hearings on Tibbs's Trial Rule 60(B) motion reveals that Rickey; deputy prosecuting attorney Fronk, who prosecuted Tibbs; David Jones, who represented Rickey in his second request for a sentence modification; deputy prosecuting attorney John Lake, who represented the State when Rickey petitioned for a sentence modification; Detective Williamson; and Detective Airy all testified there was no agreement between Rickey and the State. Deputy prosecuting attorney Fronk and Detectives Williamson and Airy all testified no offer was extended to Rickey, and Detective Williamson testified he did not have the authority to make Rickey an offer. Although Rickey testified the officers who interviewed him in 2008 mentioned a benefit—"they were like, you know, obviously you want something or you're aware that you can get something or whatnot. That was pretty much the scope of what they talked about and offered"—he explained that the conversation was not a "formal" offer: "it was vaguely discussed, you know, guys get deals all the time for this, you know, do you know that that's an option, you can ask." Dec. 7, 2015 tr. pp. 28, 34. Rickey consistently testified that, not only was there no agreement between himself and the State, he did not want to receive any benefit in exchange for his testimony against Tibbs. Rickey also testified he was sentenced to forty-five years—the minimum sentence—for the murder he committed. Finally, and notably, Rickey's second request for a sentence modification, which the State joined and attached to which was a letter of support from deputy prosecuting attorney Fronk, was denied.

[54] In short, Rickey did not receive a benefit in exchange for his testimony against Tibbs. We therefore conclude the evidence clearly supports the trial court's finding that no agreement existed between the State and Rickey. We further conclude that the evidence supports the trial court's characterization of Rickey's 2008 conversation with Detective Williamson as "a discussion . . . about what, if any, consideration Rickey Hammons was seeking in return for the information he was providing" and note that the trial court did not find that the State made an offer to Rickey. App. p. 811.

[55] In support of his argument that "an agreement clearly existed," Appellant's Br. p. 32, Tibbs highlights the evidence most favorable to his position. Relying on Rickey's vague testimony regarding the possibility of a time cut, Tibbs also asserts, in contradiction to the trial court's findings, that the State made Rickey an offer. Our standard of review does not permit us to reweigh the evidence or substitute our judgment for that of the trial court. *Weaver v. Niederkorn*, 9 N.E.3d 220, 222 (Ind. Ct. App. 2014).

[56] Because there was no offer or agreement between the State and Rickey, we also conclude Tibbs "fails to meet the materiality requirement, thereby defeating both the initial claim of newly discovered evidence and the claim of a *Brady* violation." *Kubsch*, 934 N.E.2d at 1145. In order to prove the evidence of an offer or agreement was material under either theory Tibbs advances, such an offer or agreement must have actually existed. The trial court found no agreement existed and stopped short of finding the State made Rickey an offer.

Because there was no agreement or offer, there simply was no material evidence that could have changed the outcome of Tibbs's trial.

[57] Even if the jury had the benefit of hearing Rickey's crude characterization of his 2008 discussion with the detectives as an "offer," (which Detectives Williamson and Airy deny was an offer of any sort) it also would have heard Rickey's explanation of the context of that conversation—"it was vaguely discussed, you know, guys get deals all the time for this, you know, do you know that that's an option, you can ask." Dec. 7, 2015 tr. p. 34. We agree with the trial court that there is not a reasonable probability that that evidence related to the alleged agreement or offer, when taken in context with all the other evidence, would have changed the result of Tibbs's trial.

[58] We are not unmindful of the fact that Rickey's assistance was likely the linchpin of the investigation into Rison's death. Rickey told investigators about Freeman, and Freeman's testimony was quite clearly a crucial part, if not the most crucial part, of the State's case. And we are aware that the timing of Rickey's petition for clemency and second request for a sentence modification is curious. But the trial court's findings clearly establish that there was not, in fact, an agreement between Rickey and the State. Further, the trial court found that Rickey was already serving a minimum sentence, and the State was not able to intervene to change Rickey's placement in the Department of Correction.

[59] In light of the foregoing, we conclude the trial court properly denied Tibbs's Trial Rule 60(B) motion.

## Conclusion

[60] The trial court did not abuse its discretion by excluding the third-party perpetrator evidence Tibbs sought to introduce, nor was it fundamental error to exclude evidence Tibbs wanted to use to either impeach the investigation into Rison's murder or Freeman's testimony. The trial court properly denied Tibbs's Trial Rule 60(B) motion for relief from judgment. We affirm.

[61] Affirmed.

Vaidik, C.J., and Mathias, J., concur.