## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 31 2019, 8:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas C. Allen
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samantha M. Sumcad
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Deyante A. Stephens,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 31, 2019

Court of Appeals Case No.
19A-CR-987

Appeal from the
Allen Superior Court

The Honorable
Frances C. Gull, Judge

Trial Court Cause No.
02D06-1801-MR-2

**Kirsch, Judge.**

[1] Deyante A. Stephens ("Stephens") was convicted after a jury trial of three counts of murder[1] and one count of using a firearm in the commission of the offense.[2] He appeals his convictions and raises the following restated issue for review: whether the trial court abused its discretion when it excluded evidence of an alleged third-party perpetrator.

[2] We affirm.

## Facts and Procedural History

[3] On January 19, 2018, Tomeka[3] Bennett ("Bennett") lived in a house at 1239 Lillie Street in Fort Wayne, Indiana with her children and a roommate. *Tr. Vol. 2* at 224-27, 233, 242, 247-48. Around 10:00 p.m., Bennett's brother, Paul Martin ("Martin"),[4] came over with Stephens to sell Bennett a puppy. *Tr. Vol. 3* at 4; *Tr. Vol. 4* at 47, 53. The two men stayed about ten minutes, left together, and then went to the apartment of Matthew Turner ("Turner") to hang out after getting some food. *Tr. Vol. 4* at 48-49. Later that night, Brianna Gould ("Gould"), who was pregnant at the time, came to Turner's apartment with a friend, Kassandra Townsley ("Townsley"), to hang out with Stephens, Martin, and Turner. *Id*. at 49-50; *Tr. Vol. 2* at 214-15. While there, people were

---

[1] *See* Ind. Code § 35-42-1-1.

[2] *See* Ind. Code § 35-50-2-11.

[3] The parties spell Bennett's first name as "Tamika"; however, during her testimony at trial, she spelled it as "Tomeka." *Tr. Vol. 2* at 247.

[4] We note that the parties refer to Bennett's brother as Paul Mitchell; however, the transcript reflects that his name is actually Paul Martin. *Tr. Vol. 4* at 44.

drinking alcohol. *Tr. Vol. 4* at 51. Townsley remembers that Stephens was wearing a gray sweatshirt and gray sweatpants and glasses that night and that he had a semi-automatic handgun tucked in his waistband. *Tr. Vol. 2* at 216-17. Gould and Townsley left after about an hour. *Tr. Vol. 4* at 51.

[4] After leaving Turner's apartment, Gould and Townsley went to pick up Preonda Jones ("Jones"), and Townsley, who was driving, then dropped Gould and Jones off at Bennett's house on Lillie Street in the early morning hours of January 20, 2018. *Tr. Vol. 2* at 218-19. A little bit later, Stephens, Turner, and Martin also went to Bennett's house. *Tr. Vol. 4* at 54, 100. Martin, Stephens, and Turner let themselves and Gould and Jones into the house because none of the inhabitants of the house were awake when they arrived. *Id*. at 55. Martin and Stephens went into the kitchen, and Turner went into one of the bedrooms where Bennett was. *Id*. at 56. Gould and Jones were in the bathroom. *Id*. 56, 103.

[5] Sometime later that morning, there were multiple gunshots inside the home. *Tr. Vol. 2* at 228, 235, 244; *Tr. Vol. 3* at 6, 29. The noise of the gunshots woke up Bennett and the others in the house. *Tr. Vol. 2* at 228, 235, 244; *Tr. Vol. 3* at 10, 29, 67. Bennett stayed in her bedroom but could hear a woman's voice asking for help and Stephens's distinct voice talking and yelling. *Tr. Vol. 3* at 10-11, 64-68. When Bennett did leave her bedroom a short time later, Martin and Stephens were gone, but, inside the bathroom, she found Jones, dead on the floor, and Gould in the bathtub suffering from multiple gunshot wounds.

*Tr. Vol. 4* at 60-61. Both Gould and her unborn baby, which was viable at the time, later died. *Tr. Vol. 3* at 220-21.

[6]     During the ensuing police investigation, officers observed damage to the front door of Bennett's house that was consistent with being kicked in, and the door had a smear that resembled a footprint. *Id*. at 94, 101, 143-44. Inside the bathroom, the police found multiple shell casings determined to be from a nine-millimeter handgun. *Id*. at 103-05, 145, 159. There was also a magazine for a handgun that still held eight rounds of ammunition found in the bathroom. *Id*. at 37, 110-13. The police also discovered blood stains on both the inside and outside of the back door of the house. *Id*. at 135-37; *Tr. Vol. 4* at 22. A cigar was found outside of the house, which appeared to have been dropped recently. *Tr. Vol. 3* at 99, 142-43.

[7]     Later in the morning of January 20, 2018, a man in an apartment complex approximately three miles from Bennett's house had an intruder attempt to enter his apartment. *Id*. at 72-74, 179. The intruder was later identified as Stephens. *Id*. at 76. When the resident opened the apartment door to look out, Stephens attempted to push his way into the apartment. *Id*. at 74-75. The resident was able to push Stephens out, lock the door, and call the police. *Id*. at 75. Stephens appeared to be intoxicated, had blood on his clothing, and was looking for someone and calling out a name. *Id*. at 74-75.

[8]     Fort Wayne Police Department Officer Mitchell Gearhart ("Officer Gearhart") responded to the dispatch regarding the disturbance and found Stephens behind

the apartment wearing a gray sweatshirt and sweatpants with blood on his clothes. *Id*. at 190. Initially, Stephens told Officer Gearhart to shoot him. *Id*. at 191. Stephens then told Officer Gearhart that he knew him and wanted to give the officer a hug. *Id*. at 193. Stephens also stated that he knew why the cops were looking for him, that they knew what he had done, that he had seen what was in the bathroom, and then he asked who had snitched on him. *Id*. at 194, 197, 199-200. He also mentioned a gun and a bathtub. *Id*. at 194. Stephens was taken into custody. *Id*.

[9] Autopsies were performed on all three victims, and the cause of death of the victims was determined to be multiple gunshot wounds. *Id*. at 207, 213, 220, 224. Jones had been shot three times, and Gould was shot five times. *Id*. at 207, 214-15. Gould's baby sustained one gunshot wound. *Id*. at 223.

[10] The blood found on Stephens's clothes was analyzed and came back as belonging to Gould and Jones. *Tr. Vol. 4* at 16-21. The blood stains from the back door of Bennett's home were also analyzed and shown to be DNA from Jones, Gould, and Stephens. *Id*. at 22-24.

[11] While in custody, Stephens made several telephone calls to third parties, which were all recorded. *State's Ex.* 87. In the calls, he made statements that he thought that Gould and Jones were snitches. *Id*.; *Tr. Vol. 3* at 181-82.

[12] On January 25, 2018, the State charged Stephens with three counts of murder and one count of using a firearm in the commission of the offenses. *Appellant's App. Vol. II* at 17-24. A jury trial was held, and prior to trial, the State made an

oral motion in limine to bar Stephens from presenting evidence regarding an alleged third-party perpetrator. *Tr. Vol. 2 at 25-35.* Specifically, Stephens wanted to admit text messages between a third party, David Lewis ("Lewis"), and Gould that occurred in the hours before the murders. *Tr. Vol. 3 at 23.* The trial court granted the State's motion and determined that Stephens had failed to show a reasonable connection between the crimes and the alleged third-party perpetrator, Lewis. *Tr. Vol. 2 at 35; Tr. Vol. 4 at 125.* At the conclusion of the trial, the jury found Stephens guilty as charged. *Tr. Vol. 4 at 157-58, 160.* The trial court sentenced him to sixty years for each murder conviction and twenty years for his conviction of using a firearm in the commission of the offenses, with all of the sentences to run consecutively. Stephens now appeals.

## Discussion and Decision

[13]   We review the trial court's ruling on the exclusion of evidence for an abuse of discretion. *Tibbs v. State*, 59 N.E.3d 1005, 1011 (Ind. Ct. App. 2016), *trans. denied*. "The trial court's ruling regarding the admission of evidence will be upheld if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory." *Id*. We will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id*. Generally, errors in the exclusion of evidence are disregarded as harmless unless they affect the substantial rights of a party. *Friend v. State*, 134 N.E.3d 441, 449 (Ind. Ct. App. 2019). However, "if error results from the exclusion of evidence which indicates that someone else had committed the crime, the error cannot be deemed harmless." *Tibbs*, 59 N.E.3d

at 1011 (citing *Allen v. State,* 813 N.E.2d 349, 361 (Ind. Ct. App. 2004), *trans. denied*).

[14] Stephens argues that the trial court abused its discretion when it excluded evidence of an alleged third-party perpetrator of the crimes. He contends that the text messages between Gould and Lewis that he proffered should have been admitted because they showed the communications that occurred between the two in close proximity to the time of the murders, and the text messages would have allowed the jury to "view the interactions, emotions, state of mind, and possible threats between the two as they progress through the morning." *Appellant's Br*. at 23. Further, because the evidence presented against him was circumstantial and because there was unknown DNA found at the crime scene, Stephens asserts that his proffered evidence of an alleged third-party perpetrator was exculpatory and would have raised substantial doubt as to his guilt.

[15] "Evidence which tends to show that someone else committed the crime makes it less probable that the defendant committed the crime and is therefore relevant under [Indiana Evidence] Rule 401." *Dickens v. State,* 754 N.E.2d 1, 5 (Ind. 2001) (citing *Joyner v. State,* 678 N.E.2d 386, 389 (Ind.1997)). Such evidence, however, may be excluded "if its probative value is out-weighed by unfair prejudice, confusion of the issues, or the potential to mislead the jury." *Pelley v. State,* 901 N.E.2d 494, 505 (Ind. 2009) (citing Ind. Evidence Rule 403). Before evidence of an alternative perpetrator is admissible, the defendant must show some connection between the alternative perpetrator and the crime. *Tibbs*, 59 N.E.3d at 1011 (citing *Pelley*, 901 N.E.2d at 504). While a defendant may

present alternative perpetrator evidence at trial in order to cast doubt on the defendant's guilt, the defendant must first lay an evidentiary foundation to establish that the alternative perpetrator evidence has an inherent tendency to connect the alternative perpetrator to the actual commission of the charged crime. *Pelley*, 901 N.E.2d at 505.

[16] In the present case, Stephens sought to admit into evidence text messages between Gould and Lewis that Stephens alleged showed that Gould and Lewis had a contentious, controlling relationship and were arguing just hours before the murders occurred. Stephens wished to admit this evidence to show that Lewis could have been an alleged third-party perpetrator of the murders. Stephens made an offer of proof that consisted of the text messages, and after argument by both parties, the trial court determined that Stephens had failed to demonstrate a connection between Lewis, the alleged third-party perpetrator, and the murders.

[17] During the presentation of the State's case, Stephens made his offer of proof regarding the excluded evidence. Lewis testified and Stephens's attorney questioned him about whether or not he had had a romantic or sexual relationship with Gould. *Tr. Vol. 3* at 235. Lewis denied any such relationship and stated that he and Gould were only close friends. *Id*. Stephens then put forward his offer of proof as to the text message conversation between Gould and Lewis that occurred in the hours before the murders. *Id*. at 237. The text messages between Gould and Lewis merely showed that the two had a conversation during the hours before the murders occurred. The text message

conversation ended several hours before the murders happened and did not provide a connection to the time that the murders took place or any connection whatsoever to the murders themselves. In *Lashbrook v. State*, 762 N.E.2d 756 (Ind. 2002), our Supreme Court determined that just because a third party was upset with the victim earlier that day and made a statement that the victim "was gonna die," such evidence did not tend to show that the third party committed the murder. *Id*. at 757. Likewise, here, without more, Stephens's proffered evidence that one of the victims and a third party engaged in a contentious text message conversation several hours before the murders did not tend to show that the third party committed the murders. The trial court did not abuse its discretion when it found that Stephens failed to show a connection between Lewis and the murders and when it excluded the evidence of the text messages.

[18] Affirmed.

Bailey, J., and Mathias, J., concur.