## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 24 2018, 8:40 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Ann Johnson
Indianapolis, Indiana

Valerie K. Boots
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Tiara Peoples,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 24, 2018

Court of Appeals Case No.
49A05-1707-CR-1672

Appeal from the Marion Superior Court

The Honorable Lisa Borges, Judge

The Honorable Anne Flannelly, Magistrate

Trial Court Cause No.
49G04-1607-F5-27047

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Tiara Peoples (Peoples), appeals her conviction for battery resulting in bodily injury, a Level 5 felony, Ind. Code, § 35-42-2-1(c)(1).

We affirm.

# ISSUES

Peoples presents us with two issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion by excluding evidence of the child victim's panic attack, suffered six months prior to the charged criminal conduct; and

(2) Whether the State committed prosecutorial misconduct which placed Peoples in a position of grave peril.

# FACTS AND PROCEDURAL HISTORY

In the late evening on July 12, 2016, Warren McDowell (McDowell) noticed a woman, holding a baby, and a little boy enter apartment J, which was across the hall from his own apartment, at Hosbrook Street in Fountain Square, Indianapolis, Indiana. The woman was later identified as Peoples, and the little boy was her eight-year-old son, M.Q. M.Q. was staying with Peoples for the summer but lived with his father, Martise Quiller (Quiller), in Georgia for most of the year. Peoples and M.Q. had just returned from having dinner at a local restaurant, and Peoples was talking to M.Q. in a "mean" tone of voice. (Transcript Vol. II, p. 131). M.Q. testified that Peoples bit M.Q. on his eyes,

his hands, and his nose and the bite wounds "hurted [sic] pretty bad." (Tr. Vol. II, p. 131).

[5]     A little after McDowell had observed Peoples and M.Q. enter the apartment, McDowell heard a sound like "somebody busted the door open," and looked across the hall. (Tr. Vol. II, pp. 116-17). He saw M.Q. knocking on a neighbor's door, crying and pleading that his "mam's trying to kill [him]." (Tr. Vol. II, p. 132). Before McDowell could put on his shoes and go outside to inquire what was going on, M.Q. had run down to the parking lot. As McDowell was walking down, he noticed Peoples "hollering" at M.Q. to "get his butt upstairs[.]" (Tr. pp. 119-20).

[6]     M.Q. continued running and ran towards a police car at the intersection of Shelby Sreet and Hosbrook. Indianapolis Metropolitan Police Officer Joshua Kreutzberger (Officer Kreutzberger) was heading back to roll call at approximately 9:30 p.m., when he observed M.Q. standing at the northwest corner of the intersection. Initially, Officer Kreutzberger thought M.Q. was just trying to say "hello" but then he noticed him to be upset, crying, and shaking. (Tr. Vol. II, p. 164). M.Q. told the officer that "his mother [had] assaulted him." (Tr. Vol. II, p. 165). Officer Kreutzberger "turned on the dome light in [his] car and [M.Q.] stuck his hands inside [his] window and repeated what he said, and that's when [the officer] saw all the little marks and, you know, the blood on all the – all of his knuckles." (Tr. Vol. II, p. 165). The officer also observed a cut underneath M.Q.'s right eye, a cut between his nose and his left eye, and his left eye and bottom part of his right eye were slightly swollen. (Tr.

Vol. II, p. 175). Because of M.Q.'s visible injuries, Officer Kreutzberger requested emergency medical assistance. The fire department, the emergency medical technicians, and three other officers responded to Officer Kreutzberger's call. M.Q. was transported to Riley Children's Hospital by ambulance.

[7] Indianapolis Metropolitan Police Officer Frank Vanek (Officer Vanek) arrived on the scene and talked to McDowell. Officer Vanek also knocked on Peoples' apartment door, but no one responded. Approximately one hour later, Peoples called in a missing person report and Officer Vanek was advised that Peoples was on her way to Riley Children's Hospital. Peoples did not arrive at the hospital until 11:30 p.m. Officer Vanek spoke with Peoples upon her arrival. Peoples explained to the officer that M.Q. had become upset and had run out of the apartment because she had contacted his father to come get his son "right now" after M.Q. misbehaved. (Tr. Vol. II, p. 214). Peoples said that she ran after M.Q. to find him.

[8] On July 15, 2016, the State filed an Information, charging Peoples with Count I, battery resulting in injury to a person less than 14 years of age, a Level 5 felony, I.C. § 35-42-2-1(c); and Count II, neglect of a dependent resulting in bodily injury, a Level 5 felony, I.C. § 35-46-1-4(a). Two days prior to trial, the trial court conducted a final pretrial conference at which the parties' motions in limine were addressed and decided upon. The trial court granted the State's motion in limine pertaining to any questions, comments, testimony, references, or opinions regarding M.Q.'s behavior and/or mental issues. The trial court

granted Peoples' motion as it concerned any evidence of allegations of prior violence or neglect involving Peoples and her children, and as it pertained to "photos of the alleged victim that show scars or marks on the alleged victims [sic] body that appear older, healed, and not possibly related to these allegations." (Appellant's Conf. App. pp. 81-82).

[9] On June 17, 2017, the trial court conducted a one-day jury trial. Prior to presenting evidence, the State moved to dismiss Count II, Level 5 felony neglect of a dependent, which was granted by the trial court. At the close of the evidence, the jury returned a guilty verdict on Count I, Level 5 felony battery resulting in injury to a person less than 14 years of age. On June 30, 2017, the trial court held a sentencing hearing and sentenced Peoples to six years on Count I.

[10] Peoples now appeals. Additional facts will be provided if necessary.

# FACTS AND PROCEDURAL HISTORY

I. *Admission of Evidence*

[11] Peoples contends that the trial court abused its discretion by excluding evidence of an anxienty attack suffered by M.Q. six months prior to the instant charges. Maintaining that this evidence was relevant to the jury's assessment of M.Q.'s credibility, she asserts that its exclusion affected her ability to present a complete defense.

[12] The admission or exclusion of evidence is a matter that is generally entrusted to the discretion of the trial court. *See Pribie v. State*, 46 N.E.3d 1241, 1246 (Ind. Ct. App. 2015), *trans. denied*. Therefore, a trial court's ruling excluding evidence is reviewed on appeal for an abuse of discretion. *Tibbs v. State*, 59 N.E.3d 1005, 1011 (Ind. Ct. App. 2016), *trans. denied*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id*. Moreover, the trial court's ruling will be upheld on appeal if it is sustainable on any legal reason supported by the record, even if it is not the reason used by the trial court. *Id*.

[13] During the testimony of Quiller, M.Q.'s father, Peoples requested the trial court's permission to "ask a question about [M.Q.'s] ability to perceive." (Tr. Vol. II, p. 217). She wanted to elicit testimony from Quiller about a nightmare M.Q. had experienced approximately six months prior to the charged incident. Peoples represented that "M.Q. had previously (inaudible) for hallucinations so I believe that that is relevant, just ask him about that." (Tr. Vol. II, p. 217). The trial court denied the request as being "irrelevant" and disallowed the line of questioning. (Tr. Vol. II, p. 218).

[14] During her offer to prove, Peoples questioned Quiller about the incident as follows:

> [Peoples]: Mr. Quiller, in January of 2016, you took your son M.Q. to the hospital, correct?
> [Quiller]: Well –
> [Peoples]: For hallucinations?

[Quiller]: No. My son, he had a bad migraine and he had a[n] anxiety attack and they gave us anxiety medicine. That's about it. He had a dream that he had spiders on him, and I took him to the hospital because he was acting like they was on him.

[Peoples]: Even when he was awake?

[Quiller]: Yes, ma'am.

[Peoples]: And it was long after he had woken up?

[Quiller]: Right.

[Peoples]: And it was sustained [sic] believing that the spiders were on him?

[Quiller]: Well, I mean, well, anything that touched him, that's what he was freaking out about. If his clothes rubbing against him, you do like that, that's the only reason, you know, but --

[Peoples]: And –

[Quiller]: -- it's not hallucinations.

[Peoples]: Okay. But you had called [Peoples] and told her that he was hallucinating?

[Quiller]: No, I didn't say he was hallucinating. That's not – that's not – that's not what I said. He ha[d] a[n] anxiety attack.

(Tr. Vol. II, pp. 224-25). After receiving additional argument from the parties, the trial court concluded that "the anxiety attack, the bad nightmare that was testified to by [Quiller], in January of 2016, is irrelevant as to the allegations regarding July 12, 2016." (Tr. Vol. II, p. 228).

[15] "Relevant evidence" is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence." Ind. Evidence Rule 401(a). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Evid. R. 403.

[16] The credibility of a witness may be challenged by evidence "showing a defect of capacity in the witness to observe, remember or recount the matters testified about." *Lusher v. State*, 390 N.E.2d 702, 704 (Ind. Ct. App. 1979). In *Lusher*,

we reversed a conviction where the trial court excluded evidence that the main witness experienced problems with flashbacks or hallucinations due to a drug addiction. *Id*. When experiencing an hallucination, the witness could hallucinate anything he wanted to and it would happen. *Id*. Because it was apparent that this could have cast serious doubt on the witness's ability to recall and perceive the instant events, the appellate court reversed the trial court's decision to exclude the evidence. *Id*. On the other hand, in *Denny v. State*, 524 N.E.2d 1301, 1303 (Ind. Ct. App. 1988), we noted that two isolated incidents of hallucinating occurring six months and one month prior to the incident and without a showing of the cause for the witness's problem was not sufficient to admit this evidence.

[17] Here, the evidence belied Peoples' characterization of the incident as "hallucinations" suffered by M.Q. Rather, M.Q.'s father described the incident as a single anxiety attack as a result of a bad dream. In *Lusher*, the hallucinations were frequent, incapacitating, and unpredictable. In the present case, the evidence only showed one isolated incident, which was chracterized as an anxiety attack, not even an hallucination. There was no showing for the cause of M.Q.'s problems, nor was there any showing of a pattern of similar incidents which would cast doubt on his ability to perceive and remember. A child's short-term emotional reaction to the powerful images of a dream is not unusual or indicative of an inability to distinguish reality from illusion, or to have illusions about being beaten. Thus, we conclude that the trial court did

not abuse its discretion in excluding the proffered evidence as it was not relevant to make the instant offense more or less probable.[1]

## II. *Prosecutorial Misconduct*

Next, Peoples contends that she was placed in grave peril due to the State's introduction of inadmissible and prejudicial evidence, as well as by the State's misrepresentations to the jury. In reviewing a claim of prosecutorial misconduct raised in the trial court, we must determine (1) whether misconduct occurred, and if so, (2) "whether the misconduct, under all the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (*citing Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of the impropriety of the conduct. *Id*. To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial. *Id*. Because Peoples identified two

---

[1] Peoples also claims that the trial court's exclusion of the evidence deprived her of her constitutional right to present a defense. Nevertheless, the right to present a defense is not absolute. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Schermerhorn v. State*, 61 N.E.3d 375, 379 (Ind. Ct. App. 2016), *trans. denied*. In Indiana, evidence must be relevant to be admissible. *Id*. As we already determined that evidence of M.Q.'s single anxiety attack was irrelevant to the instant offense, Peoples' constitutional right to present a defense was not violated.

instances of purported prosecutorial misconduct, we will discuss each incident in turn.

A. *State's Exhibit 1*

[19] At the outset of trial, the trial court discussed State's Exhibit 1 with the parties outside the presence of the jury. State's Exhibit 1 is a photo of M.Q. showing the injuries to his face. Peoples expressed a concern that "while it shows the boy's face, it also shows the boy's chest, which has several scars. Our position would be if we could crop the photo, that we would have no objection to it, just to show just the chin and above." (Tr. Vol. II, pp. 9-10). The trial court agreed and instructed the State to crop the portion of the photo below a small scar that can be detected just under M.Q.'s right collarbone.

[20] During M.Q.'s testimony, the trial court granted the State's permission to publish State's Exhibits 1 through 8, depicting M.Q.'s injuries. When the State started to display the photographs digitally via Powerpoint, the unredacted photo was momentarily displayed on the screen. Peoples immediately requested the photo to be taken down, contending that it violated the trial court's ruling in limine. The State represented that they had cropped the photo and mistakenly believed that the cropped photo had been integrated in the Powerpoint display. Peoples moved for a mistrial. The trial court stated:

> By showing the [E]xhibit that's been modified, they will walk in and think that that's what was flashed. That was a very quick view. Personally, I don't think that it was long enough for anybody to see what you're concerned about. I'll give you an

opportunity to make your motion. It will be outside the presence of the jury. And at this time I think it's showing, that [E]xhibit – and show me all eight exhibits right now. Show me – show them to me right now.

(Tr. Vol. II, p. 139). The trial court allowed the State to change the manner of publication to passing the photos one by one to the jury. Upon counsels' return to their seats, the State again for a second or two published the unredacted Exhibit 1 on the screen. "Both counsel scrambled. [The State] tried to physically cover the screen[.]" (Tr. Vol. II, p. 154). After taking the digital photo down again, the trial court admonished the jury:

> The [c]ourt now directs the jury that you're only to consider State's Exhibits 1 through 8 that have been personally distributed to you to view, and you are to disregard and not consider any picture that you may have seen on the screen.

(Tr. Vol. II, p. 140).

[21] During recess, the trial court heard Peoples' argument on her motion for mistrial. Arguing in support of a mistrial, Peoples asserted that, in her estimate, "the [E]xhibit was only up for a second;" however, even if only one juror saw the uncropped exhibit, "there's the potential that he'll tell the eleven other jurors about the other injuries he saw." (Tr. Vol. II, pp. 153-54). After hearing the State's arguments, the trial court ruled, in pertinent part, that:

> With respect to the flashing of the original exhibit by the State, Exhibit No. 1, which showed a scar on the alleged victim's right chest area, it is the [c]ourt's view that it truly was a very quick flash, that from the distance from the TV to the jury box, that I

don't think they could have detected that scar. Which was not easily detected. And it was on the screen so quickly and then off the screen that I don't think that there was any peril that [Peoples] suffered.

With respect to the size of State's Exhibit No. 1 as compared to the other [E]xhibits, 2 through 8, first, [Peoples] did not object to State's Exhibits 1 through 8. And State's Exhibit 1 was examined by [Peoples] at the time that they did not object to its admissibility.

I did note that when I told the State that in lieu of the TV we were going to the pictures, I did note that that picture was a different size, and that's why I said they go around one at a time, not as a group to emphasize the difference in size.

I also don't think even if they were distributed as a group that the fact that State's Exhibit No. 1 is shortened, necessarily poses any problem to the defense.

I also admonished the jury to only consider those exhibits that they saw that were personally distributed to them and they were not to consider anything that they may have viewed on the screen, and I don't think that that quick view of that picture from that distance—first, I don't think it was seen. I don't think – I disagree with the statement that it was likely that at least one juror noticed that scar because I don't think it was noticeable.

And then we went to the next scene, the next part of the screen and we had a series of photographs that were small around the screen, I don't think it was – I don't think they could have observed this.

(Tr. Vol. II, pp. 156-57). Accordingly, the trial court denied Peoples' request for a mistrial.

[22] Peoples now contends that the State imposed an evidentiary harpoon by introducing inadmissible evidence with the deliberate purpose of prejudicing the jury against her. *See Perez v. State*, 728 N.E.2d 234, 237 (Ind. Ct. App. 2000) ("An evidentiary harpoon is the placing of inadmissible evidence before the jury so as to prejudice the jurors against the defendant."), *trans. denied*. Despite the State publishing the unredacted Exhibit 1 twice, we cannot conclude that the State's publication was intentional. Prior to trial, the State had conceded that the old scars were not related to the instant incident and agreed to crop Exhibit 1. Unfortunately, the State did not update its digital display of the Exhibits and the unredacted version was momentarily displayed. This happened not once but twice. Based on the limited duration of the appearance of the unredacted Exhibit on the screen and the non-prominent visibility of the scar itself, we agree with the trial court that the State's behavior was careless to say the least, but did not amount to the deliberate conduct necessary to raise to an evidentiary harpoon which would have placed Peoples in grave peril. Moreover, the trial court admonished the jury and we must "presume the jury followed the trial court's admonishment and that the excluded testimony played no part in the jury's deliberation." *Street v. State*, 30 N.E.3d 41, 50 (Ind. Ct. App. 2015), *trans. denied*.

## 2. *Credibility of Witnesses*

[23] As a second instance of prosecutorial misconduct, Peoples points to the State's rebuttal argument. During rebuttal, the State presented that:

> What I'm saying is this, you heard the evidence today. You know you have your gut feeling, the common sense that we discussed earlier. In order for you to believe [Peoples], that means you don't believe M.Q.

(Tr. Vol. III, pp. 49-50). Peoples now maintains that the State's comment amounted to misconduct as it "improperly suggested that [Peoples] needed to present evidence contradicting M.Q.'s testimony when the State has the burden of proof." (Appellant's Br. p. 26).

[24] "A prosecutor must confine closing argument to comments based upon the evidence in the record, though he may argue both law and facts and propound conclusions based upon his analysis of the evidence." *Lambert v. State*, 743 N.E.2d 719, 734 (Ind. 2001). It is not improper for the prosecutor to focus on the uncontradicted nature of the State's case. *Harrison v. State*, 901 N.E.2d 635, 645 (Ind. Ct. App. 2009). However, weighing the credibility of the witnesses is within the province of the jury. *Gantt v. State*, 825 N.E.2d 874, 878 (Ind. Ct. App. 2005). Nevertheless, we cannot agree with Peoples that the State's statement amounted to a mischaracterization of the evidence. The entire case revolves around two individuals: M.Q. and Peoples. Both testified and their testimonies were diametrically opposed. Accordingly, believing one witness would necessarily amount to disbelieving the other. It is well settled that a prosecutor may properly comment on the credibility of a witness as long as the

assertions are based on reasons arising from the evidence. *Cooper v. State*, 854 N.E.2d 831, 836 (Ind. 2006). Here, the State did not inform the jury which witness to believe, rather its observation was a direct consequence of the testimonies of both witnesses. Accordingly, the State did not commit prosecutorial misconduct.

Continuing her argument, Peoples suggests that a combination of the accidental display of the unredacted Exhibit 1 together with the State's closing argument cumulatively placed her in a position of grave peril. We disagree. As we did not find a single instance of prosecutorial error, there is no cumulative effect which would have resulted in an unfair trial.

# CONCLUSION

Based on the foregoing, we hold that the trial court properly excluded evidence of the child victim's panic attack, suffered six months prior to the charged criminal conduct; and the State did not commit prosecutorial misconduct.

Affirmed.

May, J. and Mathias, J. concur