## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 30 2019, 9:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Russell W. Brown, Jr.
King, Brown & Murdaugh, LLC
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jason Tibbs,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

July 30, 2019

Court of Appeals Case No.
19A-PC-1085

Appeal from the LaPorte Circuit Court

The Honorable Thomas J. Alevizos, Judge

Trial Court Cause No.
46C01-1705-PC-9

**Najam, Judge.**

# Statement of the Case

Jason Tibbs appeals the post-conviction court's denial of his petition for post-conviction relief. Tibbs raises two issues for our review, which we consolidate and restate as whether the post-conviction court clearly erred when it concluded that Tibbs had not received ineffective assistance from his trial attorneys.

We affirm.

# Facts and Procedural History

The facts underlying Tibbs's conviction for murder were stated by our Court in his direct appeal:

> On March 26, 1993, sixteen-year-old Rayna Rison was working at the Pine [L]ake Veterinary Hospital ("the clinic") in LaPorte County. She had a date scheduled that evening with her boyfriend, Matt Elser. Rison was scheduled to finish work at approximately 6:00 p.m., and Elser was waiting for Rison at her house. When Rison failed to return home, Elser called the clinic and then began looking for her. Elser first went to the clinic and noticed Rison's car was not there.
>
> At approximately 7:30 p.m. that same day, someone observed what would later be identified as Rison's car parked along a road with its hood up. The police recovered the car the next day. Inside, police found a ring, which was later identified as belonging to Tibbs. On April 27, 1993, Rison's dead body was discovered in a pond. The forensic pathologist who performed Rison's autopsy concluded the cause of her death was asphyxia due to cervical compression—strangulation—and that her death was a homicide.

Tibbs and Rison were friends and dated briefly in middle school or junior high school. By 1993, Tibbs had dropped out of high school but was still in touch with Rison and still had strong romantic feelings for her. On the day Rison disappeared, Tibbs contacted his friend Eric Freeman in the late afternoon and asked Freeman to pick him up and drive him to the clinic. Freeman borrowed his girlfriend Jennifer Hammons's ("Jennifer") Buick and picked Tibbs up at his house. Tibbs had previously introduced Rison to Freeman as his girlfriend, and, on the day Rison disappeared, Tibbs told Freeman he "wanted to try to work things out with [Rison]."

When Freeman and Tibbs arrived at the clinic, Tibbs went inside to speak with Rison. After a short time, Tibbs and Rison came out of the clinic and talked; then they began to argue about their relationship. Tibbs and Rison got in the back seat of Jennifer's car, and the three "went driving." Tibbs and Rison continued arguing. Either Tibbs or Rison asked Freeman to pull over. He did, and Tibbs and Rison got out and continued arguing behind the car. According to Freeman, Rison "just didn't want to be with [Tibbs]." At some point, Freeman got out of the car and told Tibbs and Rison that he wanted to leave. Tibbs and Rison continued to argue, and Freeman observed Tibbs hit Rison then choke her with his hands. Freeman got back in the car, and Tibbs told him to open the trunk. Tibbs put Rison in the trunk, and Freeman drove back to the home of Rick and Judy Hammons, Jennifer's parents, where Freeman lived at the time.

When they arrived, Freeman parked the car in the Hammonses' pole barn. Freeman and Tibbs argued, and Tibbs stated, "If I can't have her nobody can." After a short time, they left to get Rison's car. After Freeman and Tibbs left the Hammonses' barn, they returned to the clinic. Tibbs drove Rison's car away, and Freeman followed him in Jennifer's car. Together, the men dumped Rison's body in a pond, and Tibbs weighed it down with logs. Freeman, alone, then returned to the Hammonses' house in

Jennifer's Buick. Later that evening, Tibbs stopped by the Hammonses' house, and Freeman gave him the letter jacket that had been left in the back seat of the Buick. The jacket was later discovered hanging in a tree and identified as belonging to Elser.

Unbeknownst to Freeman and Tibbs, Rickey Hammons ("Rickey"), Rick and Judy Hammons's fourteen-year-old son, was in the loft of the barn smoking marijuana when they arrived at the Hammonses' property. Rickey observed someone back Jennifer's car into the pole barn. He saw Tibbs close the barn doors and Freeman get out of the driver's seat. Rickey heard Freeman and Tibbs arguing and saw Freeman open the trunk of the car. Rickey saw a young, white woman in the trunk. "She was an off color, like—she wasn't moving. She was—I don't know. She didn't look like she had a lot of color in her face." Rickey did not say anything to Freeman and Tibbs. After the men argued about what to do next, Rickey saw them leave in the car. When Rickey saw Rison's picture in the newspaper the next day, he recognized her as the girl he saw in the trunk of his sister's car. He did not tell anyone about what he saw in the pole barn.

Ray McCarty was Rison's brother-in-law. He was married to Rison's sister Lori McCarty ("Lori"). In 1991, McCarty plead[ed] guilty to Class D felony child molesting. Rison was the victim, and she became pregnant as a result of that molestation. McCarty was sentenced to serve three years on probation and was still on probation when Rison was killed. McCarty was indicted for Rison's murder near the time she was killed, but the State later dismissed the charges.

For fifteen years, Rison's murder remained unsolved. In 2008, Rickey, who now was serving a sentence for an unrelated murder, contacted the police in order to tell them what he saw in his parents' barn in 1993. Rickey testified he neither received nor sought any benefit in exchange for his testimony. As a result of

Rickey's information, investigators located Freeman and granted Freeman immunity in exchange for the information he had regarding Rison's murder. In 2013, the State charged Tibbs with murder. Freeman gave eyewitness testimony against Tibbs during Tibbs's trial.

McCarty testified during Tibbs's case-in-chief that at approximately 5:40 or 5:45 p.m. on the night Rison disappeared, he looked at a house for sale directly across the street from the clinic. McCarty testified that after he left the house, he drove to the clinic to ask Rison if she knew where Lori was. McCarty testified the exchange with Rison took "[h]alf a minute," and then he left the clinic. McCarty admitted he told police more than one story regarding his whereabouts the night Rison disappeared. McCarty stated that he initially lied to police in order to prevent Lori from learning he had picked up a female hitchhiker that night because it might upset her. McCarty testified he did not threaten to harm Rison if she told anyone about his illegal sexual contact with her. Lori testified she did not recall telling a police officer that she vacuumed out the back of McCarty's car before police searched it, nor did she remember McCarty asking her to do so.

During his trial, Tibbs attempted to ask Officer Timothy Short, who interviewed both McCarty and Lori, whether McCarty asked Lori to vacuum out his car before the police searched it. The trial court sustained the State's objection to the question. Tibbs also sought to question McCarty about the details of his divergent stories to police, but the trial court prohibited him from doing so.

During an offer of proof, McCarty testified he was indicted for Rison's murder but was not tried. He also testified that he initially told police he was at a pig farm in the southern part of the county around or at the time Rison disappeared. As part of his offer of proof, Tibbs offered Rison's 1989 statement to police

regarding McCarty's molestation. The statement states, "[McCarty] said that 'if I didn't do as he asked of me he would hurt me, and he said that if I ever told, he would KILL me.'"

Detective Brett Airy, who began re-investigating Rison's death in 2008, testified during an offer of proof that he reviewed the reports made during the original murder investigation. He testified McCarty did not admit he had contact with Rison at the clinic until May 11, 1993, approximately six weeks after Rison disappeared, and further testified about the details of McCarty's differing stories regarding his whereabouts at the time Rison disappeared.

In November 2014, a jury found Tibbs guilty of murder. The trial court sentenced Tibbs to forty years in the Department of Correction. . . .

*Tibbs v. State*, 59 N.E.3d 1005, 1008-11 (Ind. Ct. App. 2016) (alterations in original; citations to the record omitted), *trans. denied* ("*Tibbs I*").

[4] On direct appeal, Tibbs raised three issues for our review: "whether the trial court abused its discretion by excluding evidence of an alleged third-party perpetrator," namely, McCarty; "whether the trial court abused its discretion by excluding impeachment evidence" relating to Freeman's interview with Detective Airy; and "whether the trial court properly denied Tibbs's Trial Rule 60(B) motion for relief from judgment," which he had filed on the ground that Rickey had, contrary to his testimony at trial, received a benefit from the State for that testimony. *Id.* at 1008.

[5] We affirmed Tibbs's conviction. On the first issue, we held as follows:

the evidence Tibbs sought to introduce—that McCarty was indicted for Rison's murder; that in 1989 Rison reported McCarty threatened to kill her if she disclosed he sexually molested her; that McCarty allegedly asked Lori to clean out his car; and the details of McCarty's conflicting statements related to his whereabouts around the time Rison disappeared—was neither sufficiently exculpatory nor relevant evidence of a third-party perpetrator. None of the excluded evidence made it less probable that Tibbs murdered Rison or that McCarty was responsible for her murder as required under Rule of Evidence 401.

*Id.* at 1013. We further stated:

> Assuming, without deciding, that the trial court's exclusion of the fact that McCarty was indicted for Rison's murder did somehow infringe on Tibbs's rights to confront and cross-examine, we conclude such error was harmless. McCarty's testimony was not central to (or even part of) the prosecution's case against Tibbs, and the State's case against Tibbs was extremely strong and included eyewitness testimony. We also note that Tibbs did successfully present evidence from which the jury could have concluded McCarty harbored a bias or motive to testify the way he did. We therefore conclude beyond a reasonable doubt that the presumed error did not contribute to the verdict.

*Id.* at 1015.

[6] We addressed Tibbs's second issue, regarding the alleged impeachment evidence, as follows:

> Tibbs next contends the trial court abused its discretion by excluding from evidence the transcript of Freeman's 2013 interview with Detectives Brett Airy and Al Williamson, which Tibbs states he sought to admit in order to impeach the veracity

of the investigation. Tibbs concedes he did not submit his proposed evidence in an offer of proof and that we must review his claim for fundamental error.

* * *

In his Appellant's Brief, Tibbs states he attempted to introduce the transcript in order to impeach the veracity of the investigation. He argues that the transcript contradicts Detective Airy's testimony that neither he nor Detective Williamson asked leading questions or suggested answers during Freeman's 2013 interview and that the transcript "calls into serious question whether Freeman's testimony was based upon what he said he witnessed as opposed to the details of the investigation that the detectives shared with him during the subject interview." But Tibbs's line of questions for Detective Airy at the time he sought to introduce the transcript provides no support for his argument on appeal. . . . Tibbs concluded that line of questioning by inquiring whether Detective Airy or Detective Williamson asked Freeman leading questions or suggested answers during his 2013 interview. But Tibbs did not attempt to introduce the transcript again, nor did he explain why he wanted to do so in the first place.

In his Appellant's Brief, Tibbs highlights several instances in the interview during which he contends the detectives "lead [Freeman] through his statement." We note that in these portions of the interview Freeman gave answers (e.g., about the type of car he was driving when he took Tibbs to the clinic and the time he took Tibbs to the clinic) that differ from his trial testimony. We also note that Freeman admitted during his trial testimony that he was "scared and nervous" during his interview and that "at the end of [the interview]" he was honest and truthful. We further note that, although Tibbs cross-examined Freeman regarding some of the discrepancies between his 2013 interview and his trial testimony, he did not attempt to introduce

the transcript of the 2013 interview as impeachment evidence when he cross-examined Freeman.

Based on our review of the record, it is not clear why Tibbs sought to have the transcript of Freeman's 2013 interview admitted into evidence during Detective Airy's testimony. To the extent his purpose was to highlight what he thinks were questionable interviewing techniques and impeach the officers' investigation, we conclude he has waived that argument because there is no support for it in the record. To the extent his purpose was to impeach Freeman's testimony, we again conclude Tibbs has waived that argument because he did not introduce the exhibit at the appropriate time. Alternatively, we conclude the trial court's exclusion of the transcript did not prejudice Tibbs because the jury was aware that Freeman was not consistently forthright during his interview and because Tibbs had, and took some advantage of, the opportunity to cross-examine Freeman regarding his inconsistent statements. We conclude the exclusion of the transcript did not infringe on Tibbs's right to a fair trial and, therefore, does not rise to the level of fundamental error.

*Id.* at 1015-17 (alterations in original; citations to the record and footnote omitted). We also rejected Tibbs's third argument regarding the trial court's denial of his motion to correct error.

[7]     Thereafter, Tibbs filed his petition for post-conviction relief. In that petition, Tibbs alleged that he had been denied the effective assistance of trial counsel. In particular, he alleged that his "[t]rial counsel failed to present scientific evidence that fibers from Ray McCarty's vehicle were found in Rayna Rison's hair." Appellant's App. Vol. 2 at 12. That purported "scientific evidence" was an FBI analysis conducted in the 1990s. *Id.* According to Tibbs, the failure of

his trial attorneys to introduce that evidence at his trial in 2014 "prevented Tibbs from presenting more compelling evidence of third party guilt" against McCarty. *Id.* Tibbs further alleged that his "[t]rial counsel failed to adequately" preserve in the record "the transcript of Freeman's interview with the detectives," which, according to Tibbs, "forced [Tibbs] to overcome the heightened standard of fundamental error on appeal." *Id.*

[8] The post-conviction court held a fact-finding hearing on Tibbs's petition. Following that hearing, the court entered findings of fact and conclusions of law denying Tibbs's petition. In its findings and conclusions, the post-conviction court stated in relevant part as follows:

> 9. [Tibbs's trial attorney John] Thompkins testified he was aware of the FBI "walking back" its findings [regarding fiber analyses] as a result of the National Academy of Forensic Science's 2009 article during [Thompkins's] trial preparation, and that a substantial challenge to [the FBI's findings here] was likely.

> 10. Victim Rison's sister and wife of Ray McCarty, Lori McCarty, testified that Victim Rison frequently visited and stayed at the McCarty residence[] and also was a regular passenger in their vehicles.

> 11. The probative value of the "fiber evidence" . . . is diminished by: the discrediting of forensic conclusions made prior to the National Academy of Forensic Sciences report published in 2009; and that the Victim's sister testified that Victim Rison was a frequent guest and at times lived at the McCarty residence.

* * *

14. Because of the deference attorneys receive in creating trial strategy and the dispute in probative value of the fiber analysis . . . , this Court finds that the defense counsel's judgment to not include . . . [the] fiber analysis is reasonable.

* * *

17. [Tibbs] relies on the substance of [Freeman's interview with Detective Airy] in order to attack Witness Freeman's credibility.

18. Reliance on the substance of the interview and the ensuing analysis of whether the transcripts of that interview were proper in its inclusion or exclusion generates a result that either an Abuse of Discretion *or* a Fundamental Error standard applies in reviewing the Trial Court's decision.

19. No matter which path is taken, a finding of prejudice must occur . . . .

20. . . . [W]hich analysis applies is irrelevant because the jury was aware of Witness Freeman's lack of candor and honesty in the police detective interviews. Additionally, [Tibbs] availed himself of the opportunity to cross-examine Witness Freeman about the prior inconsistent statements.

* * *

24. The jury's knowledge of Witness Freeman's prior inconsistencies, the attempt to impeach by the Defense, and that Witness Freeman's testimony was corroborated by overwhelming evidence all lead inevitably to two findings: that [Tibbs] was not prejudiced by the exclusion of Witness Freeman's transcript; and that the jury's findings were reasonably

based on the evidence such that any mistake argued by the Petitioner cannot [now] be said to have influenced the outcome.

*Id.* at 69-72. This appeal ensued.

## Discussion and Decision

[9] Tibbs appeals the post-conviction court's denial of his petition for post-conviction relief. Our standard of review in such appeals is clear:

> "The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." *Campbell v. State*, 19 N.E.3d 271, 273-74 (Ind. 2014). "When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id.* at 274. In order to prevail on an appeal from the denial of post-conviction relief, a petitioner must show that the evidence leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case entered findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (internal quotation omitted).

*Humphrey v. State*, 73 N.E.3d 677, 681-82 (Ind. 2017).

[10] Tibbs asserts that he received ineffective assistance from his two trial attorneys. As our Supreme Court has explained:

When evaluating an ineffective assistance of counsel claim, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009). To satisfy the first prong, "the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002) (citing *Strickland*, 466 U.S. at 687-88, 104 S. Ct. 2052). To satisfy the second prong, "the defendant must show prejudice: a reasonable probability (i.e. a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052).

*Id.* at 682.

In particular, Tibbs argues that his trial attorneys were ineffective for two reasons. First, he asserts that they ineffectively failed to have the FBI's 1990s fiber analysis admitted as evidence at his 2014 trial. Second, he asserts that they failed to more thoroughly impeach Detective Airy with the transcript of his interview with Freeman, which resulted in our court reviewing that issue under the heavy burden of fundamental error.

Assuming only for the sake of argument that a reasonable trial attorney would have done either of those things, Tibbs cannot show that the result of his trial or direct appeal would have been different had his attorneys done so. There is no dispute that the forensic fiber analysis conducted by the FBI here was based on flawed methodologies and that, prior to Tibbs's 2014 jury trial, it was well

known that those analyses were not reliable. A reasonable juror would not have disregarded the overwhelming evidence of Tibbs's guilt for the sake of a flawed and unreliable fiber analysis.

[13] Neither would a reasonable juror have ignored the evidence of Tibbs's guilt had his attorneys used the transcript of Detective Airy's interview with Freeman to more precisely critique Detective Airy on his interviewing techniques. Had Tibbs's trial counsel preserved that issue for our review, we would have held that reversal was not required because the evidence before the jury of Tibbs's guilt was so overwhelming that that transcript would not have mattered. *See, e.g.*, *Williams v. State*, 43 N.E.3d 578, 583-84 (Ind. 2015). As we said in *Tibbs I*, the State's evidence against Tibbs was "extremely strong." 59 N.E.3d at 1015. Thus, Tibbs's claim of ineffective assistance must fail as he cannot show prejudice resulting from any error his trial attorneys may have made on this issue.

[14] The post-conviction court did not err when it denied Tibbs's petition for post-conviction relief. Tibbs cannot show that either of the purported bases for his ineffective assistance of counsel claims would have been likely to result in different outcomes than those he received. Accordingly, we affirm the post-conviction court's judgment.

[15] Affirmed.

Bailey, J., and May, J., concur.